No. 25-7157

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

STATE OF WASHINGTON *et al.*,
*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF EDUCATION *et al.*,
*Defendants-Appellants*.

————————————

On Appeal from the United States District Court
for the Western District of Washington

————————————

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
## FOR STAY PENDING APPEAL

————————————

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

DANIEL TENNY
BENJAMIN T. TAKEMOTO
*Attorneys*
*Civil Division, Room 7258*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5364*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 16. Circuit Rule 27-3 Certificate for Emergency Motion

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form16instructions.pdf*

**9th Cir. Case Number(s)** 25-7157

**Case Name** Washington v. Department of Education

I certify the following:

The relief I request in the emergency motion that accompanies this certificate is:

A stay of the district court's preliminary injunction pending appeal.

Relief is needed no later than *(date)*: December 5, 2025

The following will happen if relief is not granted within the requested time:

The preliminary injunction requires the Department to continue to fund prior grants. If the preliminary injunction is not stayed by December 5, 2025, the Department will not reasonably be able to make new grant awards under the recent competition by the end of the year. See Applications for New Awards; School-Based Mental Health Services Grant Program, 87 Fed. Reg. 60,137, 60,138 (Oct. 4, 2022); Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 87 Fed. Reg. 60,144, 60,145 (Oct. 4, 2022).

I could not have filed this motion earlier because:

The preliminary injunction was issued on October 27, 2025. The government prepared this appeal and stay motion as quickly as possible, notwithstanding the lapse in appropriations.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 16**         *1*         *Rev. 11/21/2019*

I requested this relief in the district court or other lower court:  ◉ Yes  ○ No

    If not, why not:

 

I notified 9th Circuit court staff via voicemail or email about the filing of this motion: ◉ Yes  ○ No

    If not, why not:

 

I have notified all counsel and any unrepresented party of the filing of this motion:

On *(date)*: 11/14/25

By *(method)*: Email

Position of other parties: Oppose

    Name and best contact information for each counsel/party notified:

Cynthia Alexander (Cynthia.Alexander@atg.Wa.Gov), Jennifer Chung (Jennifer.Chung@atg.Wa.Gov), Lucy Wolf (Lucy.Wolf@atg.Wa.Gov), William McGinty (William.Mcginty@atg.Wa.Gov), Ellen Range (Ellen.Range@atg.Wa.Gov)

I declare under penalty of perjury that the foregoing is true.

**Signature** s/ Benjamin Takemoto      **Date** 11/14/25

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 16**      2      *Rev. 11/21/2019*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT .......................................................................................................2

    A.    Background ..........................................................................................2

    B.    Procedural History ..............................................................................5

ARGUMENT .......................................................................................................7

I.    The Government Is Likely to Prevail on the Merits...............................8

    A.    The Tucker Act Requires This Case to Be Brought in the Court of Federal Claims. ..................................................................................8

    B.    The Department's Non-Continuation Notices Are Committed to Agency Discretion by Law. ..............................................................15

II.    The Remaining Factors Favor a Stay. ...................................................19

CONCLUSION ...................................................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) ...........................................................................9

*Block v. Community Nutrition Institute*,
    467 U.S. 340 (1984) ........................................................................................15

*Board of Educ. for the Silver Consol. Schs. v. McMahon*,
    791 F. Supp. 3d 1272 (D.N.M. 2025) ...........................................................11

*California v. U.S. Dep't of Educ.*,
    No. 25-cv-10548, 2025 WL 3165713 (D. Mass. Nov. 13, 2025)..................11

*California v. U.S. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025) ..........................................................................12

*Climate United Fund v. Citibank*,
    No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ..........................11

*Community Legal Servs. in East Palo Alto v. HHS*,
    No. 25-2808, 2025 WL 2884805 (9th Cir. Oct. 10, 2025).....................13, 15

*Crowley Gov't Servs., Inc. v. General Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022) ........................................................................8

*U.S. Dep't of Educ. v. California*,
    604 U.S. 650 (2025) ...............................................................2, 11, 12, 19, 20

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) ........................................................................................12

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ........................................................................................15

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) ...........................................................................9

*James v. Caldera*,
    159 F.3d 573 (Fed. Cir. 1998) .........................................................................9

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) .................................................................................14

*L.A. Mem'l Coliseum Comm'n v. NFL*,
   634 F.2d 1197 (9th Cir. 1980) .................................................................20

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................ 6, 16, 17, 18

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ...................................................................................8

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ............................................................ 9, 10

*NIH v. American Pub. Health Ass'n*,
   145 S. Ct. 2658 (2025) ....................................................................2, 12, 19

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................ 7, 19

*Sustainability Institute v. Trump*,
   No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025)..........................11

*United Aeronautical Corp. v. U.S. Air Force*,
   80 F.4th 1017 (9th Cir. 2023) ....................................................................9

*United States v. Barajas-Guillen*,
   632 F.2d 749 (9th Cir. 1980) ...................................................................18

*Vera Institute of Justice v. DOJ*,
   No. 25-cv-1643, 2025 WL 1865160 (D.D.C. July 7, 2025) ........................11

*Warth v. Seldin*,
   422 U.S. 490 (1975) .................................................................................14

*Webster v. Doe*,
   486 U.S. 592 (1988) .................................................................................18

**Statutes:**

Bipartisan Safer Communities Act,
   Pub. L. No. 117-159, 136 Stat. 1313, 1342 (2022) ..................................... 3, 17

5 U.S.C. § 701(a)(2) ...........................................................................................16

5 U.S.C. § 702 ....................................................................................................10

28 U.S.C. § 1491(a)(1) ................................................................................... 9, 10

**Regulations:**

34 C.F.R. § 75.251 ...............................................................................................3

34 C.F.R. § 75.251(b) ..........................................................................................3

34 C.F.R. § 75.253(a)(5) ............................................................................1, 3, 16, 17

34 C.F.R. § 75.253(c) ..........................................................................................3

34 C.F.R. § 75.253(f)(1) ................................................................................. 1, 17

34 C.F.R. § 75.253(g) ..........................................................................................4

**Other Authorities:**

*Applications for New Awards; Mental Health Service Professional Demonstration Grant Program*,
   87 Fed. Reg. 60,144 (Oct. 4, 2022) ...................................................................3

*Applications for New Awards; Mental Health Service Professional Demonstration Grant Program*,
   90 Fed. Reg. 46,584 (Sept. 29, 2025) ...............................................................5

*Applications for New Awards; School-Based Mental Health Services Grant Program*,
   87 Fed. Reg. 60,137 (Oct. 4, 2022) ...................................................................3

*Applications for New Awards; School-Based Mental Health Services Grant Program*,
   90 Fed. Reg. 46,573 (Sept. 29, 2025) ...............................................................5

## INTRODUCTION

This case involves a category of grants that, as a matter of both regulation and contract, are subject to renewal only if the grantee receives "a determination from the Secretary [of Education] that continuation of the project is in the best interest of the Federal Government." 34 C.F.R. § 75.253(a)(5), (f)(1). Earlier this year, the Department of Education determined that certain of these grants were no longer in the best interest of the United States and therefore should not be renewed after their scheduled expiration on December 31, 2025. Instead, the Department announced a new grant competition for 2026, which closed last month. But the district court in this case issued a preliminary injunction, overriding the Department's judgment and requiring the Department to continue to fund programs that it determined are no longer in the interests of the United States.

The Department respectfully moves to stay that preliminary injunction pending appeal. The injunction is legally indefensible regardless of the applicable framework. If viewed as a contract dispute, plaintiffs' claims should have been brought in the Court of Federal Claims, where all contract claims against the United States must be channeled. And if viewed as an Administrative Procedure Act (APA) matter, judicial review is precluded because the Department's determination is expressly committed to agency discretion by law. Either way, the district court lacked authority to usurp the Department's prerogative over these discretionary funding decisions.

The equitable factors also weigh in favor of a stay pending appeal. Plaintiffs' claims are primarily monetary—the non-continuation of grants—which the Supreme Court has recently and repeatedly deemed to be reparable. *See Department of Educ. v. California*, 604 U.S. 650, 652 (2025) (per curiam); *NIH v. American Pub. Health Ass'n*, 145 S. Ct. 2658 (2025). Their other injuries—diminution of mental-health services— are too speculative, particularly considering that program funding will continue next year, possibly to these very grantees. On the other side of the ledger, the government may never recover disbursed funds, and the injunction prevents the Department from reallocating limited funding to a new set of grantees that prevailed in the recent grant competition. The government thus will incur irreparable harm if the preliminary injunction remains in effect.

Accordingly, the Court should grant a stay pending appeal by December 5, 2025, to reasonably enable the Department to make awards before the end of the month.

## STATEMENT

### A.      Background

The Department administers two competitive grant programs that promote mental-health services in schools: the School-Based Mental Health Services Grant Program (SBMH), which is designed to employ more mental-health services providers in schools, and the Mental Health Service Professional Demonstration Grant Program (MHSP), which is designed to train school-based mental-health service providers. *See*

2

*Applications for New Awards; School-Based Mental Health Services Grant Program*, 87 Fed. Reg. 60,137, 60,138 (Oct. 4, 2022); *Applications for New Awards; Mental Health Service Professional Demonstration Grant Program*, 87 Fed. Reg. 60,144, 60,145 (Oct. 4, 2022). Both programs are funded by the Bipartisan Safer Communities Act, which appropriated $1 billion "for activities under section 4108 of the [Elementary and Secondary Education Act]." Pub. L. No. 117-159, 136 Stat. 1313, 1342 (2022).

The Department has historically issued these grants as multiyear projects, under which the Secretary of Education approves the entire project at once but approves budget periods in one-year increments. *See* 34 C.F.R. § 75.251. The Secretary's approval notice, in addition to funding the initial budget period, must indicate "his or her intention to make continuation awards to fund the remainder of the project period." *Id.* § 75.251(b). And, in selecting funding applications, "the Secretary gives priority to continuation awards over new grants." *Id.* § 75.253(c). Continuation awards are not guaranteed, however. To receive funding in subsequent budget periods, the Department requires grantees to meet certain criteria, including receiving "a determination from the Secretary that continuation of the project is in the best interest of the Federal Government," *id.* § 75.253(a)(5).

Plaintiffs are a group of states with grantees of multiyear SBMH or MHSP projects. *See* Dkts. 51–57, 59–106 (declarations from each grantee describing their project). The "terms and conditions" of each award indicate that the award "supports only the budget period" listed therein and that the Secretary would continue funding

only if, among other things, "the Department determines that continuing the project would be in the best interest of the government." *E.g.*, Dkt. 54-1, at 5 (Los Angeles Unified School District grant award notification) (cleaned up).

Earlier this year, the Department reviewed SBMH and MHSP grants that were eligible for continuation awards in 2026. Following that review, the Department sent notices to recipients of 70 SBMH and 153 MHSP grants that their funding would not be continued in 2026. *See* Dkt. 148, ¶¶ 3, 6. The Department explained that those grants "reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration." Dkt. 106-2, at 2. Specifically, the grants "violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." Dkt. 106-2, at 2. Each grant, the Department concluded, was "inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued." Dkt. 106-2, at 2. The notices advised that grantees could submit reconsideration requests pursuant to 34 C.F.R. § 75.253(g), and many initially filed such requests but subsequently withdrew them. *See* Dkt. 148, ¶¶ 4–5, 7–8.

In addition to discontinuing grants that were no longer in the best interest of the government, the Department also announced a new competition for SBMH and MHSP grants. *See* Dkt. 148, ¶ 9. On September 29, 2025, the Department issued

4

notices inviting applications for new awards. *See Applications for New Awards; School-Based Mental Health Services Grant Program*, 90 Fed. Reg. 46,573 (Sept. 29, 2025); *Applications for New Awards; Mental Health Service Professional Demonstration Grant Program*, 90 Fed. Reg. 46,584 (Sept. 29, 2025). The application deadline was October 29, 2025, and (absent the preliminary injunction) the Department planned to fund the successful applicants beginning in January 2026.

### B. Procedural History

Around two months after receiving the non-continuation notices, plaintiffs filed their complaint, alleging that the notices were ultra vires and violated the APA, Spending Clause, and separation of powers. *See* Dkt. 1. Plaintiffs moved for a preliminary injunction the following week, Dkt. 49, which defendants opposed, Dkt. 147. Defendants separately moved to dismiss. Dkt. 161.

The district court denied defendants' motion to dismiss. A1. The court first determined that plaintiff-states had standing based on injuries both to the states and their instrumentalities as grantees and to third-party grantees (such as the nongovernmental organization Para Los Niños, Dkt. 56). Regarding the latter, the court reasoned that not continuing grants to third parties would "dry up the pipeline of trained mental health providers," indirectly putting a strain on state resources. A11–12. For similar reasons, the court held that plaintiffs, not grantees, were the real parties in interest. *See* A19.

The district court next determined that the Tucker Act did not preclude jurisdiction on the ground that the source of plaintiffs' claims was the Constitution, APA, and Department regulations, not the grants, and plaintiffs' requested relief was an injunction, not money. *See* A15–18.

Finally, the district court held that plaintiffs' APA claims were reviewable notwithstanding *Lincoln v. Vigil*, which held that "[t]he allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion," 508 U.S. 182, 192 (1993). The court reasoned that "*Lincoln* did not involve grants with regulatory criteria for continuation" and that the regulation that requires a secretarial determination that "continuation of the project is in the best interest of the Federal Government," 34 C.F.R. § 75.253(a), "cabins the Department's authority to discontinue funding," A20–21.

After resolving the threshold issues in plaintiffs' favor, the district court granted plaintiffs' motion for a preliminary injunction. *See* A22. The court held that plaintiffs were likely to succeed on their arbitrary-and-capricious claim based on the court's view that the notices lacked sufficiently individualized reasons and failed to consider grantees' reliance interests. *See* A34–37. The court did not address plaintiffs' other APA claims or constitutional claims. *See* A33 n.4. The court also held that the equitable factors favored plaintiffs because of the notices' effect on state resources, notwithstanding the continued funding of grants via new awards. *See* A37–42.

For these reasons, the district court preliminarily enjoined defendants from "implementing or enforcing through any means the discontinuation decisions as to affected Grantees, including recompeting Program funds" and "reinstituting the discontinuation decisions based on the same or similar reasons." A45. The "affected Grantees" covered by the preliminary injunction are listed in the court's order. A46. The district court also denied defendants' request for a stay pending appeal. A45.

## ARGUMENT

In considering a stay pending appeal, courts examine "(1) whether the stay applicant … is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties …; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation omitted). All four factors favor a stay here. Defendants are likely to prevail on the merits, because if viewed as a contract dispute this case must be presented to the Court of Federal Claims, and if viewed as an APA dispute, judicial review is precluded by the express grant of discretion to the Secretary to determine whether continuation of the awards furthers the public interest. And, on the equities, a stay would merely deprive plaintiffs of money to which they have no entitlement, whereas allowing the injunction to remain in effect would force the Department to irreversibly spend tens if not hundreds of millions of dollars in ways that it believes do not advance the interests of the United States.

## I.     The Government Is Likely to Prevail on the Merits.

On the merits, the government is likely to prevail regardless of how this case is analyzed. The non-continuation of these grants is tantamount to termination of the underlying contracts, such that the Supreme Court's orders in *California* and *American Public Health Association* make clear that APA review in federal district court is unavailable. But even if the non-continuation decisions are treated as decisions not to fund new grants, they are plainly committed to agency discretion by law and thus not reviewable under the APA's reasoned decision-making standards. Either way, the preliminary injunction cannot withstand scrutiny.

### A.     The Tucker Act Requires This Case to Be Brought in the Court of Federal Claims.

1.     The federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). The APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking relief other than money damages, *id.*, that does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

8

One of those "other statutes" is the Tucker Act. It waives immunity for "any claim against the United States founded … upon any express or implied contract with the United States" by authorizing claims for money damages in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). Thus, the "Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67–68 (D.C. Cir. 2004) (quotation omitted). This jurisdictional division ensures that contract claims against the government are channeled into the court that has "unique expertise" in that area, *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), and which Congress has generally not empowered to grant injunctive relief, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

Implied preclusion turns on substance rather than form. In other words, even if a claim is not styled as contractual, APA review is unavailable if the claim is really a disguised contract action. In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts look at "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also, e.g., United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1025 (9th Cir. 2023) (noting this Court applies *Megapulse*).

2.      Under that framework, this case should have been brought in the Court of Federal Claims.

First, the SBMH and MHSP grants are the source of plaintiffs' asserted rights. Absent those grants, plaintiffs would have no claim. Each grant is structured for a multiyear period, with annual funding periods subject to terms and conditions codified in the Department's grant regulations and agreed to by both parties. The Department did not continue the grants at issue based on one of those conditions: no determination "that continuing the project would be in the best interest of the government." Dkt. 54-1, at 5 (cleaned up). This dispute is accordingly contractual: Did the Department permissibly decide not to continue the grants on that basis? The mere fact that plaintiffs invoke the APA cannot suffice: As *Megapulse* observed, "[i]t is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA." 672 F.2d at 967 n.34 (quotation omitted).

Second, the type of relief sought is contractual in nature. Plaintiffs requested and received an injunction that barred implementation of the non-continuation decisions, thereby reviving funding for the grants. *See* Dkt. 1, at 42; A45. Seeking specific performance of the contract is quintessentially a contract claim, and all contract claims are barred under the APA whether they seek money damages or not. *See* 28 U.S.C. § 1491(a)(1) (applying to claims based "upon any express or implied contract with the United States"); 5 U.S.C. § 702 (precluding review "if any other

10

statute that grants consent to suit expressly or impliedly forbids the relief which is sought").

For these reasons, the only other court that has considered the Department's non-continuation notices properly concluded that the Tucker Act precluded APA review. *See Board of Educ. for the Silver Consol. Schs. v. McMahon*, 791 F. Supp. 3d 1272, 1284–85 (D.N.M. 2025). More generally, other courts have recognized in the wake of the Supreme Court's orders in *California* and *American Public Health Association* that claims challenging the termination of grants as arbitrary and capricious cannot proceed under the APA. *See Climate United Fund v. Citibank*, No. 25-5122, 2025 WL 2502881, at *7 (D.C. Cir. Sept. 2, 2025) ("In sum, the grantees cannot manufacture district court jurisdiction through artful pleading. Because the grantees' regulatory claims are essentially contractual, they must be heard in the Court of Federal Claims."); *Sustainability Institute v. Trump*, No. 25-1575, 2025 WL 1587100, at *1–2 (4th Cir. June 5, 2025); *California v. Dep't of Educ.*, No. 25-cv-10548, 2025 WL 3165713, at *15 (D. Mass. Nov. 13, 2025); *Vera Institute of Justice v. DOJ*, No. 25-cv-1643, 2025 WL 1865160, at *11 (D.D.C. July 7, 2025).

3.    This district court formalistically focused on the label of plaintiffs' claims (APA, Spending Clause) and request for relief (injunction). *See* A15–18. But a plaintiff cannot circumvent the Tucker Act with formalistic labels. In *California*, for example, states advanced APA claims that the Department had impermissibly terminated grants. There, as here, the Department terminated grants that involved programming

that the Administration preferred not to fund. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96 (1st Cir. 2025). The district court ordered reinstatement of the grants. *Id.*

The First Circuit declined to stay that order, but the Supreme Court issued a stay. Notably, the district court here parroted the First Circuit's reasoning that the Supreme Court rejected, treating the APA rather than the contract as the source of plaintiffs' rights. *Compare* A15–16, *with California*, 132 F.4th at 96–97 ("[T]he essence of the claims is not contractual" but that defendant's "actions [were] insufficiently explained, insufficiently reasoned, and otherwise contrary to law—arguments derived from the [APA]" (citation and quotation omitted)). The Supreme Court explained, however, that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *California*, 604 U.S. at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

Similarly, in *NIH v. American Public Health Association*, the Supreme Court stayed an injunction against grant terminations that the First Circuit had held were arbitrary and capricious. 145 S. Ct. 2658, 2660 (2025). Citing *California*, the Court held that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* (cleaned up).

The district court's decision cannot be reconciled with these Supreme Court decisions. The district court relied heavily on this Court's order in *Community Legal Services in East Palo Alto v. HHS*, No. 25-2808, 2025 WL 2884805 (9th Cir. Oct. 10, 2025), to characterize plaintiffs' claims as "garden-variety APA claims." A17–18. That case was decided in a stay posture before the *American Public Health Association*. In a statement regarding the denial of rehearing en banc after *American Public Health Association*, the panel majority in *Community Legal Services* made clear that its reasoning in that case turned on an agency's "statutory and regulatory obligations to ensure that unaccompanied children in immigration proceedings have legal representation," not a contractual obligation to the plaintiffs. *See* 2025 WL 2884805, at *1, *5 (noting plaintiffs' claim that the government violated the Trafficking Victims Protection Reauthorization Act and an Office of Refugee Resettlement rule and that plaintiffs had no contractual relationship with the government). By contrast, plaintiffs here have no statutory or regulatory claims independent of their contracts. Indeed, the only regulatory provisions they cite are found in the terms and conditions of the contracts themselves. *See, e.g.*, Dkt. 54-1, at 5. And unlike the statute and regulation at issue in *Community Legal Services*, which this Court reasoned could be violated absent a contract, § 75.253 operates only if an underlying contract exists: for the government to arbitrarily and capriciously determine that a "project is in the best interest of the Federal Government," there must be a contract in the first place.

The district court was likewise mistaken to rely on *Community Legal Services* for the proposition that injunctive relief was proper insofar as it was provided to grantees who are not parties to the case. If anything, that factor cuts against the district court's award as to those entities. Although the government conceded that the plaintiff states could proceed on behalf of their own instrumentalities, the district court extended its injunction beyond the states and their instrumentalities to other entities, including two entirely private entities. *See* A46 (listing grantees covered by the injunction); *see also* Dkt. 56, ¶ 9 (describing Para Los Niños as an organization that manages several "independent public charter schools"); Dkt. 59, ¶ 4 (describing the University of Redlands as "a private, independent, nonprofit liberal arts university"); A11 (acknowledging that some grantees "are not instrumentalities of Plaintiff States").

Notwithstanding "the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,'" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)), the district court determined that the injunction should extend beyond the parties on whose behalf the states were entitled to proceed because there was "evidence of irreparable harm flowing from the discontinuation decisions" to plaintiff-states. A44. But the district court did not explain how California, with a population of 39 million, would be irreparably harmed by discontinued funding to a handful of grantees that provide mental health services in the state. On this logic, states could claim to be harmed by the cessation of funding to all manner of residents,

14

giving rise to the sort of *parens patriae* standing by states against the federal government that the Supreme Court has repeatedly rejected. *See, e.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 294–95 (2023).

Moreover, even if the preliminary injunction as to these grantees could overcome this hurdle, relief would still be precluded. It would be anomalous if a remedy were available to nonparties that is not available to the parties to the contract themselves. *See Community Legal Servs.*, 2025 WL 2884805, at \*15 (Bumatay and VanDyke, JJ., dissenting from the denial of rehearing en banc); *see also Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded.").

In short, the Supreme Court's recent stay orders and considerable precedent from other courts make clear that decisions to terminate grants cannot be challenged as arbitrary and capricious under the APA—instead, the Tucker Act provides the sole and exclusive remedy in the Court of Federal Claims.

### B. The Department's Non-Continuation Notices Are Committed to Agency Discretion by Law.

Even if plaintiffs could evade the Tucker Act's jurisdictional bar, it would not help them. To the extent that the non-continuation decisions could be characterized as new agency action distinct from the underlying grant agreements—which would

require plaintiffs to disclaim rights stemming from those grant agreements—APA review would still be unavailable. By regulation, the Department is entitled to discontinue a multiyear project if the Secretary determines that it is no longer "in the best interest of the Federal Government." 34 C.F.R. § 75.253(a)(5). That is a purely discretionary judgment for the Department; it is not subject to judicial second-guessing under the APA's reasoned decision-making standards. *See* 5 U.S.C. § 701(a)(2) (excluding from scope of APA review any determinations that are "committed to agency discretion by law").

The Supreme Court made clear in *Lincoln v. Vigil*, 508 U.S. 182 (1993), that agency decisions like this—to discontinue a previously funded program and reallocate those funds to more productive uses—are committed to agency discretion by law and not reviewable under the APA. In *Vigil*, the Supreme Court explained the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. Thus,

> an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'

*Id.* at 193 (quotation omitted).

"Of course," the Court went on, agencies must comply with any operative statutes. *Id.* But if the agency does so (and satisfies whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude," such as by testing the decision against the APA's standards for reasoned decisionmaking. *Id.*

*Vigil* controls here. Like the appropriations statute in that case, the Bipartisan Safer Communities Act appropriated a lump sum of $1 billion to the Department "for activities under section 4108 of the [Elementary and Secondary Education Act]," Pub. L. No. 117-159, 136 Stat. at 1342, leaving it to the Department to decide how best to spend that money. To codify and reinforce that discretion, the Department promulgated a regulation and included in the terms and conditions of every grant at issue in this case the following: "The Secretary may decide not to make a continuation award if … [a] grantee fails to … [r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." 34 C.F.R. § 75.253(a)(5), (f)(1); *see also, e.g.*, Dkt. 54-1, at 5. Exercising that discretion, the Department determined that certain SBMH and MHSP grants were no longer in the best interest of the Federal Government.

The district court asserted, without explanation, that this regulation "cabins the Department's authority to discontinue funding" and therefore distinguishes this case from *Vigil. See* A20–21. But there were some constraints on the agency's discretion in

17

*Vigil* too: the agency was compelled to comply with its "statutory mandate to provide health care to Indian people." 508 U.S. at 194. The relevant point is that while a court can enforce those congressional limits on agency authority, it cannot impose additional restrictions on decisions of this kind, including by second-guessing the agency's priorities.

Furthermore, the only applicable regulation codifies, rather than constrains, the agency's discretion by authorizing the Secretary to determine whether the continuation of a grant is in the best interests of the federal government. Language authorizing the Executive to determine what is "in the interests of the United States" has repeatedly been recognized as judicially unreviewable. *See Webster v. Doe*, 486 U.S. 592, 600–01 (1988) (holding that a statute authorizing the CIA Director to terminate an employee "whenever he shall deem such termination necessary or advisable in the interests of the United States" was unreviewable under the APA because that language "fairly exudes deference to the Director, and appears … to foreclose the application of any meaningful judicial standard of review"); *cf. United States v. Barajas-Guillen*, 632 F.2d 749, 753 (9th Cir. 1980) (describing in the immigration context a determination of "the best interests of the United States" to be "a wide range of discretion"). The district court did not identify any "meaningful standard against which to judge the agency's exercise of discretion" that these projects are no longer in the best interest of the Federal Government, *see Vigil*, 508 U.S. at 191 (quotation omitted), instead

seeking to require the agency to justify determinations that fall within the agency's unreviewable discretion. That holding cannot be reconciled with *Vigil* or *Webster*.

In sum, the Department's decision not to continue funding for these projects and then to recompete funding for new projects better aligned with the government's interests is committed to agency discretion by law and is therefore unreviewable under the APA, even assuming it is not impliedly precluded by the Tucker Act.

## II. The Remaining Factors Favor a Stay.

The balance of harms and public interest overwhelmingly favor a stay pending appeal. *See Nken*, 556 U.S. at 435 (noting these factors merge in cases involving the government).

The district court's preliminary injunction imposes irreparable harm on the government and harms the public interest by requiring the payment of money that the government may never recover. As in *California*, the government "is unlikely to recover the grant funds once they are disbursed." 604 U.S. at 651–52; *see also American Pub. Health Ass'n*, 145 S. Ct. at 2660 (determining that the government incurred irreparable harm because "[t]he plaintiffs do not state that they will repay grant money if the Government ultimately prevails"). Plaintiffs have not promised to return withdrawn funds, and the funds will otherwise be disbursed to nonparty grant recipients from whom the court would likely lack authority to order their return. The district court also did not require a bond, further exposing the government's substantially larger injuries. A44–45. Moreover, by committing funding to previous

grantees, the preliminary injunction prevents the Department from funding new grants from the recent competition.

By contrast, plaintiffs have not established that they would suffer any substantial irreparable harm if the injunctions were stayed. To the extent that plaintiffs have identified a legally cognizable injury, *see supra* § I.B, the gravamen of that injury is monetary—the classic example of reparable harm. *See L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980) (observing that "monetary injury is not normally considered irreparable"). Plaintiffs have made no showing that they face existential harm without these funds. And, if plaintiffs believe the non-continuation was unlawful, they are free to seek monetary relief in the Court of Federal Claims, and can use those funds to continue their programs. *See California*, 604 U.S. at 652.

The district court also concluded that plaintiff-states would suffer irreparable harm stemming from "the immediate cessation of mental health services" and other related harms. *See* A38. But the district court incorrectly assumed that such services would stop. The Department intends to continue funding services and has already solicited and received applications for grants in 2026. The district court's only response is that "schools and graduate programs will be harmed by a loss of expertise in staff members, even if they could eventually rehire staff for those positions." A40. But it builds speculation on speculation to suppose that, even assuming the current grantees do not receive new grants based on new applications, staff will be let go (programs could receive funding from other sources) and that any staff hired under

new funding will be worse than the current staff. In addition to being speculative, these alleged harms highlight the extent to which the district court arrogated to itself the authority to determine which grants should be funded. And in any event, such commonplace changes to staff in a handful of school districts does not amount to irreparable harm to the plaintiff-states.

## CONCLUSION

The Court should stay the district court's preliminary injunction pending appeal and grant an immediate administrative stay pending consideration of this motion.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
*/s/ Benjamin T. Takemoto*

BENJAMIN T. TAKEMOTO
  *Attorneys*
  *Civil Division, Room 7258*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*

  *(202) 616-5364*

November 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,077 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2025, I electronically filed the foregoing with the Clerk of the Court by using the ACMS system. Service will be accomplished by the ACMS system and by email to all counsel of record.


*/s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO

# ADDENDUM

## TABLE OF CONTENTS

Order Granting Motion to Dismiss, Dkt. 190................................................................ Add.1

Order Granting Preliminary Injunction, Dkt. 193 ..................................................... Add.22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, et al.,

     Plaintiff(s),

  v.

UNITED STATES DEPARTMENT OF
EDUCATION, et al.,

     Defendant(s).

CASE NO. C25-1228-KKE

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

In 2018 and 2020, Congress established and funded two grant programs via the United States Department of Education ("the Department") to support mental health services at elementary and secondary schools throughout the country. Recognizing the prevalence of violence and traumatic crises in schools, and the negative impact of these disruptions on the learning environment, Congress allocated appropriations to the Department to "support learning environments where students feel safe, supported, and ready to learn." Dkt. No. 1 ¶ 44 (citation modified). The Department funded hundreds of multi-year grants via these programs.

But in April 2025, the Department notified certain grant recipients that their funding would not be renewed at the end of their current budget period, which expires December 31, 2025. Sixteen states filed this lawsuit against the Department and its secretary to challenge the Department's decision to discontinue funding to their grantees, seeking a court order that would

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 1

enjoin implementation of that decision and require the Department to issue legally compliant continuation decisions before the next budget period. Dkt. No. 1 at 44–45.

Defendants filed a motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim. Dkt. No. 161. After considering the parties' briefing, the relevant record, and the oral argument of counsel, the Court finds that the complaint's allegations are sufficient to withstand a challenge to Plaintiffs' standing as well as to this Court's subject matter jurisdiction. Therefore, the Court will deny Defendants' motion to dismiss.

## I.     BACKGROUND

### A.     Congress Identified the Need to Increase School-Based Mental Health Services.

In 2018, following the tragic shooting deaths of 14 students and three staff members at Marjory Stoneman Douglas High School in Parkland, Florida, Congress created the Mental Health Service Professional Demonstration Grant Program ("MHSP") in the Department to increase the number of mental health professionals serving the nation's public schools. Dkt. No. 1 ¶ 41. Congress appropriated no more than $10 million to this program to

> test and evaluate innovative partnerships between institutions of higher learning and States or high-need local educational agencies to train … mental health professionals qualified to provide school-based mental health services, with the goal of expanding the pipeline of these workers into low-income public elementary schools and secondary schools in order to address the shortages of mental-health service professionals in such schools.

*Id.* (quoting H.R. Rep. No. 115-952, at 543 (2018) (Conf. Rep.), *available at* https://www.congress.gov/115/crpt/hrpt952/CRPT-115hrpt952.pdf).

Shortly thereafter, President Trump established a Federal Commission on School Safety to make recommendations for improving school safety. Dkt. No. 1 ¶ 42 (citing Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 84 Fed. Reg. 29180, 29181 (June 21, 2019)). Noting the lack of access to mental health professionals in high-poverty

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 2

districts and schools where needs are the greatest, this commission made a series of recommendations, including expanding access to mental health care services in schools, where treatment is much more likely to be effective and completed. *Id.* (citing Betsy DeVos, et al., Federal Commission on School Safety, Final Report of the Federal Commission on School Safety 37 (Dec. 18, 2018), *available at* https://www2.ed.gov/documents/school-safety/school-safety-report.pdf).

For fiscal year 2020, Congress expanded this effort and appropriated $10 million to establish the Department's School-Based Mental Health Services Grant Program ("SBMH"), to "increase the number of qualified, well-trained … mental health professionals that provide school-based mental health services to students." Dkt. No. 1 ¶ 44 (citing Explanatory Statement, DIVISION A-DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2020, at 134 (Dec. 16, 2019), *available at* https://docs.house.gov/billsthisweek/20191216/BILLS-116HR1865SA-JES-DIVISION-A.pdf).

For fiscal year 2021, Congress maintained MHSP funding at $10 million and increased SBMH funding to $11 million. Dkt. No. 1 ¶ 45. In fiscal year 2022, Congress increased the appropriations for the MHSP to $55 million and for SBMH to $56 million. *Id.*

In May 2022, school violence again shook the nation as a former student shot and killed 19 students and two teachers at an elementary school in Uvalde, Texas. Dkt. No. 1 ¶ 46. In response, Congress dramatically increased the funding for both programs, appropriating an additional $100 million per year for each program for fiscal years 2022 through 2026 via the Bipartisan Safer Communities Act. *Id.* ¶ 47.

//

//

//

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 3

**B.** **The Department Established Grant Program Priorities and Awarded Multi-Year Grants.**

Beginning in 2019 and 2020, when the first MHSP and SBMH grant applications were invited (respectively), and in subsequent years when grant applications were solicited, the Department set forth in the Federal Register the priorities that would be used to judge grant applications for that year. Dkt. No. 1 ¶¶ 58–66. Each set of priorities was published only after completing notice-and-comment rulemaking, as required by statute. *Id.* ¶¶ 50–51.

The 2019 notice published for the MHSP grant competition stated one "absolute priority" that all applicants were required to meet:

> Expand the capacity of high-need [local educational agencies ("LEAs")] in partnership with [institutes of higher education ("IHEs")] to train school-based mental health services providers … with the goal of expanding the pipeline of these professionals into high-need public elementary schools and secondary schools in order to address the shortages of school-based mental health service providers in such schools.

Dkt. No. 1 ¶ 59 (quoting 84 Fed. Reg. 29180, 29181 (June 21, 2019)). In 2022, the Department again engaged in rulemaking to establish priorities for future MHSP grants. After providing notice and reviewing comments, the Department announced four final priorities:

> (1) expand the number of school-based mental health services providers in high-need LEAs through partnerships with IHEs, wherein IHE graduate students would be placed in high-need LEAs; (2) increase the number of school-based mental health services providers in high-need LEAs that reflect the diverse communities served by the high-need LEAs; (3) provide evidence-based pedagogical practices in mental health services provider preparation programs or professional development programs that are inclusive and that prepare school-based mental health services providers to create culturally and linguistically inclusive and identity-safe environments for students when providing services; and (4) partner with historically black colleges and universities; tribal colleges and universities; and minority-serving institutions.

*Id.* ¶ 61 (citing 87 Fed. Reg. 60083 (Oct. 4, 2022)).

The Department engaged in the same priority-setting process for the SBMH, beginning in 2020 and again in 2022. The four "final priorities" announced in 2022 were:

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 4

> (1) proposals from [state educational agencies ("SEAs")] to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need through recruitment and retention; (2) proposals from LEAs with demonstrated need to increase the number of credentialed school-based mental health services providers through recruitment and retention; (3) proposals prioritizing respecialization, professional retraining, or other preparation plan that leads to a state credential as a school-based mental health services provider and that is designed to increase the number of services providers qualified to serve in LEAs with demonstrated need; and (4) proposals to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need who are from diverse backgrounds or who are from communities served by the LEAs with demonstrated need.

Dkt. No. 1 ¶ 65 (citing 87 Fed. Reg. 60092, 60097 (Oct. 4, 2022)).

When the Department awarded new MHSP/SBMH grants, it approved them for a five-year project period: providing funds for the first year and stating its intention to fund the remainder of the project through one-year continuation awards. Dkt. No 1 ¶ 4. Department regulations provide that grantees approved for multi-year projects do not apply and compete to receive continuation awards after that first year; instead, the Department reviews information relevant to a grantee's performance for that year to evaluate whether the project made substantial progress. *Id.* ¶ 55. According to Department regulations, priority should be given to funding continuation awards over new grant applications. *Id.* ¶ 113.

## C.    The Department Awarded Multi-Year MHSP and SBMH Grants in Plaintiff States.

Plaintiffs are 16 states whose elementary and secondary schools have offered mental health services supported by grants awarded via the MHSP and the SBMH. In furtherance of the priorities published by the Department, grantees in Plaintiff States ("Grantees") applied for and were awarded multi-year MHSP/SBMH grants. For example, the Department awarded a five-year SBMH grant to Educational Service District 189 ("NWESD"), an LEA that serves as regional liaison between Washington state and 35 school districts in northwest Washington. Dkt. No. 1 ¶ 70. Forty percent of NWESD's schools were unable to access critical mental health services for

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 5

students due to barriers such as high student-to-provider ratios, attrition, complexity and intensity of mental health challenges, and geographic isolation. *Id*. Notably, two of the counties in NWESD's service area are located on islands and three other counties are in remote mountain areas far from urban corridors. *Id*. NWESD was able to use the SBMH grant to develop a recruiting package that allowed it to fill positions more quickly than anticipated. *Id.* ¶ 72. By the second year of its five-year project, NWESD had exceeded its early recruitment and retention goals. *Id*. The increase in staffing has already allowed NWESD to improve its mental health provider-to-student ratio by 60%—from 1:1,160 to 1:656. *Id*.

Similarly, the Department awarded a five-year MHSP grant to the University of Washington's SMART Center for its Workforce for Student Well-Being Initiative ("WSW"). Dkt. No. 1 ¶ 74. The WSW funds competitive conditional scholarships to graduate students enrolled in six schools of social work across Washington, and requires these students to work in a high-need school district in Washington for a minimum of two years after graduation. *Id.* ¶¶ 75–76. As of halfway through the third year of the grant program period, the WSW project has recruited and trained 27 graduate students committed to maintaining employment as school social workers in high-need school districts across Washington state. *Id.* ¶ 77.

The complaint also describes grant-funded programs in other Plaintiff States. For example, the Michigan Department of Education was awarded a five-year MHSP grant. Dkt. No. 1 ¶ 78. This grant funded the Michigan Earn, Learn, and Serve in Schools program, which aims to create jobs for 165 new school mental health providers working in high-need schools across Michigan to combat a critical shortage of school-based mental health professionals. *Id*. Similarly, Oregon State University received grant funds to train school counselors in partnership with four central Oregon school districts that had experienced a significant decline in available mental health services. *Id.* ¶ 93. The complaint further alleges multiple grant programs in California, including

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 6

1  partnerships between numerous county offices of education and local agencies, the University of

2  California, and five California State University campuses aimed at increasing the availability of

3  mental health professionals serving California communities.  *Id.*  ¶¶ 88–91.

4         The complaint alleges these programs have been successful at increasing school-based

5  mental health services across the Plaintiff States.  Dkt. No. 1 ¶ 79.   Specifically, Plaintiffs cite a

6  finding from the National Association of School Psychologists that "during the Programs' first

7  year under Congress's transformative funding appropriation, grantees served nearly 775,000

8  elementary and secondary students and hired nearly 1,300 school mental health professionals." *Id.*

9  Plaintiffs further allege these programs have resulted in decreased suicide risk, absenteeism and

10  behavioral issues at high-need schools; significantly reduced student wait time for services; and

11  allowed schools to successfully recruit and retain mental health professionals in underserved

12  communities throughout Plaintiff States.  *Id.* ¶ 5.

**D.     The Department Notified Grantees of Discontinuation.**

14        On April 29, 2025, the Department notified "most or all" Grantees in Plaintiff States that

15  their grants (hereinafter "Grants") would be discontinued at the end of the current budget period

16  (December 31, 2025).  Dkt. No. 1 ¶ 80.  Plaintiff States allege the discontinuation notices were

17  identical and stated:

18        This letter provides notice that the United States Department of Education has
          determined not to continue your federal award, S184xxxxxxx, in its entirety,
19        effective at the end of your current grant budget period. See, inter alia, 34 C.F.R.
          § 75.253(a)(5) and (f)(1). …

20
          The Department has undertaken a review of grants and determined that the grant
21        specified above provides funding for programs that reflect the prior
          Administration's priorities and policy preferences and conflict with those of the
22        current Administration, in that the programs: violate the letter or purpose of Federal
          civil rights law; conflict with the Department's policy of prioritizing merit, fairness,
23        and excellence in education; undermine the well-being of the students these
          programs are intended to help; or constitute an inappropriate use of federal funds.

24

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

> The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

*Id.* In conjunction with sending the notices, the Department informed Congress that it was discontinuing approximately $1 billion in awards, and that it planned to re-compete those funds with different priorities. *Id.* ¶¶ 6, 81.

Plaintiff States filed this action on June 30, 2025, claiming that the Department did not comply with its own regulations or the Administrative Procedure Act ("APA") in discontinuing the Grants, and that its actions also violate the Constitution's Spending Clause and Separation of Powers and are *ultra vires*. Dkt. No. 1. Specifically, Plaintiff States allege the discontinuation "notices providing the same boilerplate explanations untethered to specific grants and the performance of specific grantees" lack the reasoned explanation required by the APA. *Id.* ¶¶ 100, 103. Plaintiff States further allege that the Department violated the APA by implementing new priorities without engaging in the statutorily required notice-and-comment rulemaking, and that the Department acted contrary to its regulations by failing to consider grantee performance in making continuation awards, failing to prioritize continuation awards over new grants, and retroactively applying new priorities to previously approved grants. *Id.* ¶¶ 104, 111–13. The same allegations form the basis for Plaintiff States' constitutional and ultra vires claims. *Id.* ¶¶ 130–56.

Plaintiff States subsequently filed a motion for preliminary injunction. Dkt. No. 49. After the briefing on the motion was complete, the parties filed notices of supplemental authority, and the Court ordered the parties to provide supplemental briefing. Dkt. Nos. 154, 155, 156, 157, 158, 159. The Court held oral argument on the motion for preliminary injunction, during which the Department's counsel indicated that Defendants would be filing a motion to dismiss later that day. Dkt. No. 167 at 24.

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 8

1    Defendants indeed filed a motion to dismiss, and the Court held oral argument on that

2    motion after the close of briefing. Dkt. Nos. 161, 172, 187. The motion to dismiss is now ripe for

3    resolution and will be denied for the following reasons.

4                                    **II.    ANALYSIS**

5    **A.    The Complaint's Allegations Establish That Plaintiff States Have Standing and the
     Authority to Bring the Claims Asserted.**

6    Article III of the United States Constitution limits the jurisdiction of federal courts to

7    deciding "Cases" and "Controversies," which in turn requires that "at least one plaintiff must have

8    standing to sue." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019). "To have standing, a

9    plaintiff must allege an injury in fact 'that is concrete, particularized, and actual or imminent; fairly

10   traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'"

11   *Id.* (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)). Requiring a plaintiff to

12   establish an injury in fact "helps to ensure that the plaintiff has a 'personal stake in the outcome of

13   the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth

14   v. Seldin*, 422 U.S. 490, 498 (1975)).

15   A defendant may challenge a plaintiff's lack of standing via a motion to dismiss under

16   Federal Rule of Civil Procedure 12(b)(1). *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134,

17   1142–43 (9th Cir. 2024). Where, as here, a defendant brings a facial attack on jurisdiction in a

18   Rule 12(b)(1) motion, the court is confined to resolving the motion based on the allegations in the

19   complaint. *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036,

20   1039 n.2 (9th Cir. 2003). "For purposes of ruling on a motion to dismiss for want of standing,

21   both the trial and reviewing courts must accept as true all material allegations of the complaint and

22   must construe the complaint in favor of the complaining party." *Warth,* 422 U.S. at 501.

23

24

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 9

1  Defendants claim Plaintiff States lack standing to challenge the discontinuation decisions.

2  Dkt. No. 161 at 7–8.  They contend that only two paragraphs in the complaint describe the

3  relationship between Plaintiff States and Grantees:

> Defendants' unlawful actions have already caused and will cause immediate and
> devastating harm to Plaintiffs.  Starting this fall, many schools in Plaintiff states
> will no longer be able to reliably provide mental health services to kids that need
> them most.  These discontinuances threaten the very purpose of these Programs—
> to protect the safety of our children by permanently increasing the number of mental
> health professionals providing mental health services to students in low-income and
> rural schools.
>
> If the discontinuances are not rescinded, Plaintiff educational agencies will be
> forced to lay off the very same professionals they recruited and hired to provide
> mental health services at their rural and low-income schools using Program funds.
> Plaintiff institutes of higher education will be forced to terminate financial support
> for graduate student internships to provide mental health services to rural and low-
> income schools.  As a result, hundreds of graduate students will make the difficult
> choice whether they should enter or continue a graduate program no longer able to
> offer tuition assistance—drying up a workforce pipeline Congress recognized
> needed development.

13  Dkt. No. 1 ¶¶ 15–16.  In their briefing, Defendants argue that these allegations are insufficient to

14  establish that any Plaintiff State has standing to represent the interest of any Grantee.  Dkt. No.

15  161 at 7–8.  Defendants note that although the complaint references "Plaintiff educational

16  agencies" and "Plaintiff institutes of higher education," Plaintiffs are in fact states rather than

17  educational agencies or institutes of higher education.  *Id*.  Defendants also question whether the

18  attorneys general for Plaintiff States may pursue an action on behalf of "unnamed third parties"

19  that are merely located in those states without an official connection to them.  *Id*. at 9.

20  Notwithstanding these arguments, Defendants clarified at oral argument that they do not

21  challenge Plaintiff States' standing as to their own state-component Grantees, such as the

22  University of Washington or the Michigan Department of Education.  The Department's

23  concession that Plaintiff States have standing via their instrumentalities is fatal to Defendants'

24  motion to dismiss for want of standing.  The Ninth Circuit recognizes that "[a]s a general rule, in

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 10

an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (citing *Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008)). The Ninth Circuit has also held, more broadly, that "[t]he general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993). Thus, Defendants' concession that Plaintiff States have standing via their instrumentalities is sufficient to permit this case to proceed.

Even if Defendants had not so conceded, the Court finds that the complaint adequately pleads a fiscal harm to *each* Plaintiff State resulting from Defendants' actions, even as to Grantees that are not instrumentalities of Plaintiff States, such as private universities training mental health providers to work in public schools. *See, e.g.*, Dkt. No. 1 ¶ 94. While Defendants argue that Plaintiff States have neither standing nor authority to bring claims on behalf of non-State entity Grantees, at oral argument, counsel for Plaintiff States emphasized that they are not bringing claims "on behalf of" third-party Grantees at all, but rather, the States are suing to protect their *own interests* in light of the harm that results to them due to the discontinuation decisions. For example, the complaint alleges that:

> If Defendants are not enjoined from implementing the Non-Continuation Decision, [G]rantees in Plaintiff states will be forced to lay off school-based mental health service providers, reducing access to much-needed mental health services to their rural and low-income schools. These [G]rantees will lose qualified mental health service providers; and the benefits of the relationships their students have developed with these providers. The spillover effect of students turning to community mental health services—to the extent they are available—will tax Plaintiffs' already-strained mental health care system.

Dkt. No. 1 ¶ 86. This allegation adequately identifies a fiscal harm to Plaintiff States that will flow from Defendants' actions: whether a particular Grantee is a State entity or not, the discontinuation

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 11

of any Grant will decrease student access to school-based services and lead students in each Plaintiff State to seek needed mental health services elsewhere, namely "Plaintiffs' already-strained mental health care system." *Id*. The complaint further alleges that the discontinuation of the Grant-funded partnerships in Plaintiff States will dry up the pipeline of trained mental health providers willing to work in rural and low-income communities, and that "Plaintiffs' relationships with community partners will be irreparably damaged because Plaintiffs can no longer honor the commitments they made to provide mental health services to the children in these communities." *Id.* ¶ 87.

Defendants characterize these allegations as conclusory or speculative (Dkt. No. 180 at 4), but "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). The Court finds that Plaintiff States' allegations adequately identify a general injury to the States that logically follows from the discontinuation of any Grantee's funding. *See Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1175 (9th Cir. 2024) (noting that while an "injury need not be direct, there must be a strong 'causal chain' that 'links' the federal action to the alleged harm" (quoting *California v. Azar*, 911 F.3d 558, 571–72 (9th Cir. 2018)); *see also Diamond Alt. Energy, LLC v. Envt'l Prot. Agency*, 606 U.S. __, 145 S. Ct. 2121, 2136 (2025) (explaining that where standing depends on "predictable" behavior of third parties, "commonsense inferences may be drawn"). Because Grantees generally seek to provide mental health services for students with high need in low-income and rural areas, any services students seek after discontinuation of school-based services will likely be provided by Plaintiff States, where those services are available at all. *See* Dkt. No. 1 ¶¶ 86, 89, 94. As the students who would benefit from continuation of the Grants

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 12

are currently receiving services and have therefore demonstrated a need for them, and are also located in rural or low-income areas with few (if any) private providers available to them, there is only one link in the chain between discontinuing Grants and an increased use of State-funded providers. *Id.* The Court does not find this link to be so attenuated or unpredictable that a reasonable inference cannot be drawn.

Finally, the complaint also alleges that each Plaintiff State's attorney general has authority to bring this action to redress harms suffered by Plaintiff States. Dkt. No. 1 ¶¶ 21–36. Therefore, because the complaint adequately alleges an injury to Plaintiff States, and the authority of the attorneys general to bring claims to redress those injuries, the Court denies Defendants' motion to dismiss the complaint for want of standing.

**B.  The Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Is Denied.**

A complaint must be dismissed under Rule 12(b)(1) if the court lacks subject matter jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In this case, Defendants contend that the Court lacks subject matter jurisdiction over Plaintiff States' claims because they are contract-based and jurisdiction lies only in the Court of Federal Claims. Dkt. No. 161 at 10–19.

"Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" *United States v. Bormes*, 568 U.S. 6, 9–10 (2012) (quoting *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33–34 (1992)). "Congress has enacted several broad waivers of the United States' sovereign immunity." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168 (9th Cir. 2017). A plaintiff "may sue the United States only if Congress has waived sovereign immunity for the lawsuit, and may bring its claim in federal district court only if Congress has provided for jurisdiction there." *North Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (en banc). The APA waives sovereign immunity for suits "seeking relief

other than money damages" against a federal agency, so long as no other statute "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702.

Even if an APA action does not seek money damages, it may nonetheless contain a contract claim mischaracterized as an APA claim, which would fall outside the APA's waiver of sovereign immunity. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. __, 2025 WL 2415669 (2025); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025). Per the Tucker Act, the exclusive jurisdiction for such claims is found in the Court of Federal Claims:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). But the Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if the action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

The Tucker Act likewise deprives district courts of jurisdiction to hear contract claims disguised as constitutional claims. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647–48 (9th Cir. 1998). Although sovereign immunity does not bar claims against federal officials whose actions "go beyond limitations" on "powers [] limited by statute" or the Constitution, that *ultra vires* exception to sovereign immunity does not apply to contract-based claims. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 704 (1949) ("The Government as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right.").

Courts, including those in the Ninth Circuit, look to factors first identified in *Megapulse* to determine whether a claim against the United States is a contract claim in disguise:

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 14

> The classification of a particular action as one which is or is not "at its essence" a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate). Where … there is a possible alternative basis for jurisdiction independent of the Tucker Act, such as is arguably the case before us, we must be more deliberate in our examination. Although it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions, we must not do so in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.

672 F.2d at 968. Post-*Megapulse*, the Supreme Court explained that a district court has jurisdiction to set aside an agency action under the APA, even if that judgment eventually results in the agency paying sums of money, if that "outcome is a mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law." *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988).

In this case, Defendants contend that Plaintiff States' APA and constitutional claims are contract claims in disguise, seeking to enforce the Grants as contracts in order to compel the Department to continue funding the Grants. Dkt. No. 161 at 13. But for their part, Plaintiff States insist that their injury arises from violations of statutes, regulations, and the Constitution, rather than any breach of the Grant terms, and note that their complaint does not "seek an order requiring Defendants pay pursuant to their grants." Dkt. No. 174 at 23. Plaintiff States point to their complaint's prayer for relief, seeking a procedural rather than a contractual remedy: new decisions on continuation that comply with both the APA and the Constitution. *Id*. (citing Dkt. No. 1 at 44–45). Plaintiff States also emphasize that the Grants will be discontinued in the future rather than terminated, and that the Grantees are still receiving funds (for now), and thus no contract to pay has been breached. *Id*.

The Court agrees that none of Plaintiff States' claims sounds in contract, considering first the source of their claims. Plaintiff States' claims allege violations of the APA, the Department's regulations, and the Constitution, without any reference to the terms of the Grants. Specifically,

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 15

Plaintiffs allege that the Department adopted new regulatory priorities without engaging in notice and comment rulemaking as required by the General Education Provisions Act (20 U.S.C. §§ 1221e-4, 1232a(2), (d)) and then retroactively applied the new priorities to discontinue the existing programs in Plaintiff States.  Dkt. No. 1 ¶¶121-129.  Plaintiffs further allege that Defendants violated Department regulations by unlawfully relying on the new priorities in making continuation decisions and failing to give priority to continuation awards over new grants.  *Id.* ¶¶ 112-113.  The Ninth Circuit recently found similar allegations to present statutory, not contract, claims. [1]  *See Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, __ F.4th __, 2025 WL 2884805, at *4-6 (9th Cir. Oct. 10, 2025) ("Plaintiffs advance standard APA claims that the Government violated statutory (TVPRA) and regulatory (Foundational Rule) obligations and acted arbitrarily and capriciously by changing position without reasoned explanation."); [2] *see also*, *e.g.*, *Maryland v. Corp. for Nat'l & Cmty. Serv.,* 785 F. Supp. 3d 68, 105 (D. Md. 2025) ("The source of the rights for the States' notice-and-comment claims is a federal statute, not the grants.").

Moreover, Plaintiffs do not allege a violation of any grant term, either as the source of their claims or in their request for relief.  That the Department continues to pay out on the Grants and did not terminate them also undermines the availability of contract remedies.  Finally, though many Grantees are state instrumentalities, some are not.  As the Ninth Circuit recently reiterated, where

---

[1] Moreover, such a challenge could be analogized to the vacatur of agency guidance in *NIH*, which was not at issue in the Supreme Court's order.  *See NIH*, 2025 WL 2414669, at *2–3 (Barrett, J., concurring).  As Justice Barrett explained there, "[v]acating [internal agency guidance explaining new priorities for awarding grants] does not reinstate terminated grants[,]" and therefore a challenge to that agency guidance would not necessarily be funneled to the Court of Federal Claims as a disguised contract claim.  *Id.*

[2] Defendants argue that the Supreme Court's interim decisions in *California* and *NIH* undermine this Court's jurisdiction.  As the Ninth Circuit has now interpreted both *California* and *NIH* to permit a district court's exercise of jurisdiction over APA claims arising from grant-related scenarios similar to the Grants at issue here, this Court is required to do the same.  *See Yong v. I.N.S.*, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000) ("[O]nce a federal circuit court issues a decision, the district courts within that circuit are bound to follow it[.]").

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 16

no privity exists between the plaintiffs and the government, "the Court of Federal Claims's jurisdiction does not cover this dispute." *Cmty. Legal Servs.*, WL 2884805, at *7. Under these circumstances, the Court finds that the source of Plaintiff States' claims supports the exercise of jurisdiction.

The Court reaches a similar conclusion after considering the type of relief Plaintiff States seek. Defendants' repeated characterizations in briefing and at oral argument notwithstanding, the complaint does not seek monetary relief either explicitly or implicitly. *See* Dkt. No. 1 at 44–45. Instead, Plaintiff States seek an injunction setting aside the discontinuation decisions based upon the new priorities, preventing the Department's re-competing of the Grant funds, and requiring the Department to make new continuation decisions consistent with 34 C.F.R. § 75.253(b) before the next budget period. *Id.* Plaintiff States acknowledge that new decisions must be made, but seek only to require the Department to make "lawful" decisions, rather than to require continuation of Grantee funding. *See* Dkt. No. 167 at 51–52. The Ninth Circuit has characterized such claims as "garden-variety APA claims." *See Cmty. Legal Servs.*, 2025 WL 2884805, at *3.

Further, even if some or all of the Grantees' funding would be continued via new decisions, that would not transform Plaintiff States' claims into claims for "money damages" under discontinued Grant contracts. *See, e.g.*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (finding that where plaintiffs seek relief that "would not be determined by reference to the terms of the contract[,]" the claims are not in essence contract claims). Thus, because Plaintiff States request that Defendants issue new continuation decisions consistent with their statutory, regulatory, and constitutional obligations, rather than seeking to enforce any particular term of the Grants themselves, the Court finds that the relief sought by Plaintiff States confirms the Court's jurisdiction here. *See Cmty. Legal Servs.*, 2025 WL 2884805, at *6–7 (discussing the second

*Megapulse* prong).  Because both *Megapulse* prongs favor the Court's exercise of jurisdiction, the Court will deny Defendants' motion for lack of subject matter jurisdiction.

In so doing, the Court acknowledges that Defendants cite two recent cases where courts have found, in grant-related scenarios, that plaintiffs' APA claims were in fact contractual in nature and therefore forbidden under the Tucker Act.  Dkt. No. 161 at 15 (citing *Climate United Fund v. Citibank, N.A.*, __ F.4th __, 2025 WL 2502881 (D.C. Cir. Sep. 2, 2025); *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025)).  These out-of-circuit decisions are not binding on this Court and are, moreover, distinguishable as involving terminated grants that plaintiffs sought to reinstate, rather than future discontinuances that plaintiffs sought to set aside.  Here, where Plaintiff States request "a process correction, not a payment direction" (Dkt. No. 167 at 16), the Court finds that, under binding Ninth Circuit authority, Plaintiff States' claims "fall outside the jurisdictional bounds of the Tucker Act[.]" *Cmty. Leg. Servs.*, 2025 WL 2884805, at *8.

## C.     The Defendants' Motion To Dismiss for Failure to State a Claim is Denied.

Defendants' motion seeks dismissal on two additional grounds under Federal Rule of Civil Procedure 12(b)(6): (1) that the Grantees, rather than Plaintiff States, are the real parties in interest; and (2) the Department's discontinuation decision is not subject to judicial review.

In deciding a motion to dismiss under Rule 12(b)(6), a court examines the complaint to determine whether, if the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To state a plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court will address each of Defendants' arguments in turn.

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 18

1       *1.  Plaintiff States Are the Real Parties in Interest.*

Federal Rule of Civil Procedure 17(a)(1) requires that an action "must be prosecuted in the name of the real party in interest." Defendants' motion argues that Grantees, rather than Plaintiff States, are the real parties in interest here, although they note that "[t]he federal rules do not contain a specific procedure for raising an objection that a plaintiff is not a real party in interest." Dkt. No. 161 at 6.

Defendants' concession at oral argument that Plaintiff States have standing to seek redress of injuries flowing from the discontinuation of grants to State instrumentalities guts most of Defendants' "real party in interest" argument. Plaintiff States are the real party in interest when their instrumentalities have been injured. *See State of Alaska v. Chevron Chem. Co.*, 669 F.2d 1299, 1302 (9th Cir. 1982) (rejecting a "real party in interest" challenge where a state attorney general was authorized to bring a suit on behalf of state instrumentalities); *Corp. for Nat'l & Comm. Serv.*, 785 F. Supp. 3d at 98 (finding that states have standing to challenge the "loss of federal funding for grants awarded to state service commissions and state instrumentalities").

Moreover, because the Court has found that the complaint alleges that Plaintiff States will suffer fiscal harm via their State-funded mental health services due to Defendants' discontinuation of any Grant, Plaintiff States seek to redress their own harms in this action with respect to Grantees that are not State instrumentalities as well. Accordingly, the Court will deny Defendants' motion to dismiss this action for lack of a real party in interest.

*2.  The Non-Continuation Decision is Reviewable Under the APA.*

Defendants raise an additional challenge to the Court's exercise of jurisdiction here, contending that the Department's decision to discontinue the Grants constitutes a discretionary agency decision not subject to judicial review. Dkt. No. 147 at 14–16, Dkt. No. 161 at 3. Defendants' argument relies on *Lincoln v. Vigil*, 508 U.S. 182 (1993), which involved yearly lump-

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 19

sum appropriations from Congress to the Indian Health Service ("IHS"). From 1978 to 1985, IHS funded the Indian Children's Program ("ICP") using those appropriations, but in 1985 announced that it would discontinue funding ICP's direct clinical services in favor of funding nationwide treatment efforts. *Id*. at 187–88. Children eligible for ICP services sued, arguing that IHS' "decision to discontinue direct clinical services" violated several statutes (including the APA), regulations, and the Due Process Clause of the Fifth Amendment to the United States Constitution. *Id*. at 189. The Supreme Court reasoned that "[t]he allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion" because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id*. at 192. Accordingly, the *Lincoln* court concluded that judicial review of IHS' decision under the APA was unavailable. *Id*. at 193–94.

Although Defendants urge the Court to find that *Lincoln* is analogous, the Court finds the facts here distinguishable because, as even Defendants acknowledge, *Lincoln* did not involve grants with regulatory criteria for continuation. Accordingly, this case does not present the "rare circumstance[]" at issue in *Lincoln* where a court would have "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln*, 508 U.S. at 191. The Department must comply with its own regulations when determining whether to renew a grant award for another budget year. *Confederated Tribes & Bands of Yakima Indian Nation v. Fed. Energy Reg. Comm'n*, 746 F.2d 466, 474 (9th Cir. 1984) ("It is a well-known maxim that agencies must comply with their own regulations."). The existence of these regulations means that, unlike the IHS in *Lincoln*, the Department does not have unfettered discretion to discontinue grant funding for any reason or no reason at all, but that it must comply with regulatory requirements. *See* 34 C.F.R. § 75.253(a). Because this regulation cabins the Department's authority to discontinue funding,

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 20

*Lincoln* is distinguishable. *See, e.g.*, *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 328 F. Supp. 3d 1133, 1147 (E.D. Wash. 2018) (finding that 34 C.F.R. § 75.253(a) governs an agency's ability to terminate a grant and therefore creates "a meaningful standard of review" under the APA). Accordingly, the Court rejects Defendants' argument that the discontinuation decisions are not subject to judicial review.

### III.    CONCLUSION

For these reasons, the Court DENIES Defendants' motion to dismiss. Dkt. No. 161. The Courtroom Deputy is directed to issue an order requiring the parties to file a joint status report to assist in setting a case schedule no later than October 31, 2025.

Dated this 21st day of October, 2025.

Kymberly K. Evanson
United States District Judge

ORDER DENYING DEFENDANTS' MOTION TO DISMISS - 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>Plaintiff(s),<br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, et al.,<br><br>Defendant(s). | CASE NO. C25-1228-KKE<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

In 2018 and 2020, Congress established grant programs via the United States Department of Education ("the Department") to fund mental health services for elementary and secondary schools throughout the country. Recognizing the prevalence of violence and traumatic crises in schools, and the resultant negative effect on the learning environment, Congress allocated appropriations to the Department to "support learning environments where students feel safe, supported, and ready to learn." Dkt. No. 1 ¶ 44 (citation modified). The Department funded hundreds of multi-year grants via these programs.

But in April 2025, the Department notified certain grant recipients that their funding would not be renewed at the end of their current budget period, which (in most cases) expires December 31, 2025. Sixteen states filed this lawsuit against the Department and its secretary to challenge the Department's decision to discontinue funding to their grantees, seeking to enjoin implementation

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 1

of that decision and to require the Department to issue legally compliant continuation decisions before the next budget period begins.  Dkt. No. 1 at 44–45.

Plaintiff States filed a motion for preliminary injunction, requesting that the Court enjoin implementation and enforcement of the discontinuation decisions, and enjoin new discontinuation decisions based on the same or similar reasons.  Dkt. No. 49-1.[1]  Plaintiff States also request that the Court enjoin the Department's re-competing of the discontinued funds.  *Id.*  After considering the parties' briefing on the motion, supplemental briefing, and notices of supplemental authority (Dkt. Nos. 49, 147, 150, 156, 157, 158, 159, 185), and the oral argument of counsel, the Court finds that Plaintiff States are entitled to preliminary relief as to most of the Grantees documented in the record.  The Court will therefore issue a modified preliminary injunction with respect to those Grantees in Plaintiff States.

## I.    BACKGROUND[2]

### A.    Congress Identified the Need to Increase School-Based Mental Health Services.

In 2018, following the tragic shooting deaths of 14 students and three staff members at Marjory Stoneman Douglas High School in Parkland, Florida, Congress created the Mental Health Professional Demonstration Grant Program ("MHSP") in the Department to increase the number of mental health professionals serving the nation's public schools.  Dkt. No. 1 ¶ 41.  Congress appropriated no more than $10 million to this program to

> test and evaluate innovative partnerships between institutions of higher learning and States or high-need local educational agencies to train … mental health professionals qualified to provide school-based mental health services, with the goal of expanding the pipeline of these workers into low-income public elementary schools and secondary schools in order to address the shortages of mental-health service professionals in such schools.

---

[1] This order refers to the parties' briefing by CM/ECF page number.

[2] The Court reiterates background facts from its prior order denying Defendants' motion to dismiss (Dkt. No. 190) for the sake of completeness.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 2

*Id.* (quoting H.R. Rep. No. 115-952, at 543 (2018) (Conf. Rep.), *available at* https://www.congress.gov/115/crpt/hrpt952/CRPT-115hrpt952.pdf).

Shortly thereafter, President Trump established a Federal Commission on School Safety to make recommendations for improving school safety. Dkt. No. 1 ¶ 42 (citing Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 84 Fed. Reg. 29180, 29181 (June 21, 2019)). Noting the lack of access to mental health professionals in high-poverty districts and schools where needs are the greatest, this commission made a series of recommendations, including expanding access to mental health care services in schools, where treatment is much more likely to be effective and completed. *Id.* (citing Betsy DeVos, et al., Federal Commission on School Safety, Final Report of the Federal Commission on School Safety 37 (Dec. 18, 2018), *available at* https://www2.ed.gov/documents/school-safety/school-safety-report.pdf).

For fiscal year 2020, Congress expanded this effort and appropriated $10 million to establish the Department's School-Based Mental Health Services Grant Program ("SBMH"), to "increase the number of qualified, well-trained … mental health professionals that provide school-based mental health services to students." Dkt. No. 1 ¶ 44 (citing Explanatory Statement, Division A-Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2020, at 134 (Dec. 16, 2019), *available at* https://docs.house.gov/billsthisweek/20191216/BILLS-116HR1865SA-JES-DIVISION-A.pdf).

For fiscal year 2021, Congress maintained MHSP funding at $10 million and increased SBMH funding to $11 million. Dkt. No. 1 ¶ 45. In fiscal year 2022, Congress increased the appropriations for the MHSP to $55 million and for SBMH to $56 million. *Id.*

In May 2022, school violence again shook the nation as a former student shot and killed 19 students and two teachers at an elementary school in Uvalde, Texas. Dkt. No. 1 ¶ 46. In

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 3

response, Congress dramatically increased the funding for both programs, appropriating an additional $100 million per year for each program for fiscal years 2022 through 2026 via the Bipartisan Safer Communities Act. *Id.* ¶ 47.

The MHSP and SBMH programs are subject to Congress's directive via the General Education Provisions Act ("GEPA") that the Department require grant applicants to:

> develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.

20 U.S.C. § 1228a(b).

## B. The Department Established Grant Program Priorities and Awarded Multi-Year Grants.

Beginning in 2019 and 2020, when the first MHSP and SBMH grant applications were invited (respectively), and in subsequent years when grant applications were solicited, the Department set forth in the Federal Register the priorities that would be used to judge grant applications for that year. Dkt. No. 1 ¶¶ 58–66. Each set of priorities was published only after completing notice-and-comment rulemaking, as required by statute. *Id.* ¶¶ 50–51.

The 2019 notice published for the MHSP grant competition stated one "absolute priority" that all applicants were required to meet:

> Expand the capacity of high-need [local educational agencies ("LEAs")] in partnership with [institutes of higher education ("IHEs")] to train school-based mental health services providers … with the goal of expanding the pipeline of these professionals into high-need public elementary schools and secondary schools in order to address the shortages of school-based mental health service providers in such schools.

Dkt. No. 1 ¶ 59 (quoting 84 Fed. Reg. 29180, 29181 (June 21, 2019)).  In 2022, the Department

again engaged in rulemaking to establish priorities for future MHSP grants.  After providing notice

and reviewing comments, the Department announced four final priorities:

> (1) expand the number of school-based mental health services providers in high-need LEAs through partnerships with IHEs, wherein IHE graduate students would be placed in high-need LEAs; (2) increase the number of school-based mental health services providers in high-need LEAs that reflect the diverse communities served by the high-need LEAs; (3) provide evidence-based pedagogical practices in mental health services provider preparation programs or professional development programs that are inclusive and that prepare school-based mental health services providers to create culturally and linguistically inclusive and identity-safe environments for students when providing services; and (4) partner with historically black colleges and universities; tribal colleges and universities; and minority-serving institutions.

*Id.* ¶ 61 (citing 87 Fed. Reg. 60083 (Oct. 4, 2022)).

The Department engaged in the same priority-setting process for the SBMH, beginning in

2020 and again in 2022.  The four "final priorities" announced in 2022 were:

> (1) proposals from [state educational agencies ("SEAs")] to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need through recruitment and retention; (2) proposals from LEAs with demonstrated need to increase the number of credentialed school-based mental health services providers through recruitment and retention; (3) proposals prioritizing respecialization, professional retraining, or other preparation plan that leads to a state credential as a school-based mental health services provider and that is designed to increase the number of services providers qualified to serve in LEAs with demonstrated need; and (4) proposals to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need who are from diverse backgrounds or who are from communities served by the LEAs with demonstrated need.

Dkt. No. 1 ¶ 65 (citing 87 Fed. Reg. 60092, 60097 (Oct. 4, 2022)).

When the Department awarded new MHSP/SBMH grants, it approved them for a five-year

project period: providing funds for the first year and stating its intention to fund the remainder of

the project through one-year continuation awards.  Dkt. No. 1 ¶ 4.  Department regulations provide

that grantees approved for multi-year projects do not apply and compete to receive continuation

awards after that first year; instead, the Department reviews information relevant to a grantee's performance for that year to evaluate whether the project made substantial progress. *Id.* ¶ 55. According to Department regulations, priority should be given to funding continuation awards over new grant applications. *Id*. ¶ 113.

**C.     The Department Awarded and Then Discontinued Multi-Year MHSP and SBMH Grants in Plaintiff States.**

Plaintiffs are sixteen states whose elementary and secondary schools have offered mental health services supported by MHSP and SBMH grants.  In furtherance of the priorities published by the Department, grantees in Plaintiff States ("Grantees") applied for and were awarded multi-year MHSP/SBMH grants.  The declarations submitted in support of the motion describe a range of partnerships between states and LEAs, IHEs, and in some cases non-profit organizations. *See* Dkt. Nos. 51–57, 59–104.  The declarations detail the lack of mental health providers available in specific areas in Plaintiff States and explain the efforts taken by the states and their agencies and partners to fulfill the purposes of the MHSP and SBMH programs: increasing the pipeline of credentialed school-based mental health professionals working in rural and underserved areas while providing direct services to students in high-needs schools. *Id*.

As noted earlier in this order, when a multi-year grant project is approved, the Department funds the first year and typically continues funding beyond the first year.  34 C.F.R. § 75.251(b)(2) (the Department "indicates [its] intention to make continuation awards to fund the remainder of the project period"); 89 Fed. Reg. 70300, 70316 (Aug. 29, 2024) ("In general, we do not deny a large number of non-competing continuation awards …").   In previous budget years, the Department would notify grantees in December of continued funding for the next calendar year, and any notices of discontinuation would be sent earlier. *See* Dkt. No. 53 ¶¶ 11, 13.  Many Grantees testified that in their experience, discontinuation of a project's funding is very rare and

occurs only in cases of misconduct, and even then, grantees are typically given notice and opportunities to make corrections.  *Id.*; *see also*, *e.g.*, Dkt. No. 99 ¶ 14, Dkt. No. 104 ¶ 11, Dkt. No. 105 ¶ 16.

But on April 29, 2025, the Department notified "most or all" Grantees in Plaintiff States that their grants (hereinafter "Grants") would be discontinued at the end of the current budget period (December 31, 2025).  Dkt. No. 1 ¶ 80.  Plaintiff States allege the discontinuation notices were identical and stated:

> This letter provides notice that the United States Department of Education has determined not to continue your federal award, S184xxxxxxx, in its entirety, effective at the end of your current grant budget period. See, inter alia, 34 C.F.R. § 75.253(a)(5) and (f)(1). …

> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

*Id*.  In conjunction with sending the notices, the Department informed Congress that it was discontinuing approximately $1 billion in awards, and that it planned to re-compete those funds with different priorities.  *Id*. ¶¶ 6, 81.

Plaintiff States have submitted evidence describing both the programs funded by the Grants and the impact of the discontinuation decisions.  For example, Plaintiff State Rhode Island provided testimony from Rosemary Reilly-Chammat, Ed.D., of the Rhode Island Department of Elementary and Secondary Education ("RIDE"), which is the "state agency responsible for ensuring every student has access to high-quality teaching and learning opportunities" and tasked with setting "statewide educational priorities."  Dkt No. 99 ¶ 4.  Dr. Reilly-Chammat testified that

Rhode Island's student-to-counselor ratio was far below the recommended average, and that its student population faced "urgent and ongoing mental health challenges" in the wake of the COVID-19 pandemic. *Id.* ¶¶ 9–10. RIDE received a SBMH grant in 2022, which has (among other things) funded nine new school-based mental health professionals and placed 22 graduate-level behavioral health interns across four partner LEAs statewide. *Id.* ¶¶ 11, 13. Dr. Reilly-Chammat testified that discontinuation of RIDE's Grant has led to a pause in hiring, termination of existing staff positions, and the scaling back of planned service expansions, which "directly undermines Rhode Island's strategy to build a more sustainable, diverse, and qualified mental health workforce for schools" and causes "ongoing" harm to its mission. *Id.* ¶¶ 19, 29, 31. She further testified that the decision undermines years of trust building and collaboration between the state, LEAs, IHE partners and community-based organizations, which "compromises Rhode Island's credibility as a stable partner in mental health systems development and may discourage future participation in similarly ambitious state-led efforts." *Id.* ¶ 30.

Similarly, Megan Welter, Ph.D., of the Maine Department of Education described the SBMH Grant her entity received, which allowed nine participating school districts to hire 10 new school-based mental health professionals and retain an additional four providers with Grant funds. Dkt. No. 88 ¶¶ 8, 12. Grant funds also allowed IHEs to fund Maine graduate students pursuing degrees and licensure in school-based mental health fields. *Id.* ¶ 12. Dr. Welter averred that because of the discontinuation of this Grant, "Maine will suffer damage to relationships with LEAs and to the SBMH graduate programs" and rural Maine schools face the imminent loss of 14 mental health providers. *Id.* ¶ 17. She further testified to losses of critical services for students in rural areas following the loss of staff and funding for teletherapy, the resulting impact on community-based mental health services in Maine, and the "abrupt end" to the state's work with three public universities in Maine that are developing Maine's school-based mental health workforce pipeline,

providing services that are "crucial to addressing student mental health needs in [the] state." *Id.* ¶¶ 18–19. Declarations from additional state education departments describe similar partnerships and harms arising from the sudden discontinuation of these programs. *See e.g.*, Dkt. No. 80 (Colorado Department of Education), Dkt. No. 84 (Illinois State Board of Education), Dkt. No. 89 (Michigan Department of Education), Dkt. No. 106 (Wisconsin Department of Public Instruction).

Numerous public universities also submitted declarations describing their Grants and the impact of the discontinuation decisions. For example, Katie Stalker, MSW, Ph.D., testified that the University of Buffalo, which is part of the State University of New York system, has used MHSP Grant funds to create a fellowship program for graduate social work students placed for training in rural schools. Dkt. No. 95 ¶ 10. As a result of the discontinuation of its Grant, the University of Buffalo will be forced to terminate 10 internship placements, "disrupting professional training pathways for graduate students." *Id.* ¶ 18. This will cause significant harm to both students and rural communities in western New York, as 3,000 students will lose access to critically needed mental health services and 36 graduate social work trainees will lose placements in rural schools after December 31, 2025. *Id.* Other public universities in California, Colorado, Connecticut, Delaware, Massachusetts, Maryland, New York, Oregon, and Washington created similar training programs and describe similar immediate harms stemming from the abrupt end of partnerships with state and local agencies, loss of staff and graduate student employees, mid-year cancellation of scholarships and research projects, and the immediate loss of services currently being provided to students in Plaintiffs States via the Grants. *See e.g.*, Dkt. Nos. 63, 77, 81, 82, 85, 86, 93, 98, 103, 104.

LEAs also attest to similar harms. For example, Natalie Gustafson of Washington state's Northwest Educational Service District 189 ("NWESD 189") explained how its Grant funds have allowed it to recruit and hire 19 school-based mental health professionals plus three clinical

supervisors and two paid interns. Dkt. No. 102 ¶¶ 24, 26. Gustafson testified that the discontinuation of the Grant results in the loss of staff members and undermines NWESD 189's mission to promote equity and excellence through leadership and service. *Id*. ¶ 36. She further testified that the area served by NWESD 189 is home to several community mental health agencies, but they cannot accommodate all the students who will lose access to services without the Grant. *Id*. ¶ 32. The discontinuation also exacerbates the ongoing shortage of mental health professionals willing to work in rural and low-income Washington communities. *Id*. ¶ 34. Again, the record reflects similar harms resulting from the sudden end of programs addressing similar needs in other LEAs throughout Plaintiff States. *See e.g.*, Dkt. No. 53 (San Diego County Office of Education), Dkt. No. 69 (Solano County Office of Education), Dkt. No. 100 (Washington's Educational Service District 100), Dkt. No. 103 (Washington's Educational Service District 105).

**D.    Plaintiff States Filed This Lawsuit.**

Plaintiff States filed this action on June 30, 2025, claiming that the Department did not comply with the Administrative Procedure Act ("APA") in discontinuing the Grants, and that its actions also violate the United States Constitution's Spending Clause and Separation of Powers and are ultra vires. Dkt. No. 1. With respect to the APA claims, Plaintiff States allege the discontinuation decisions are arbitrary and capricious for several reasons, are contrary to law, and were enacted without required notice-and-comment rulemaking. *Id*. ¶¶ 95–115, 121–29. The same allegations form the basis for Plaintiff States' constitutional and ultra vires claims. *Id*. ¶¶ 130–56.

Plaintiff States subsequently filed a motion for preliminary injunction. Dkt. No. 49. After the briefing on the motion was complete, the parties filed notices of supplemental authority, and the Court ordered the parties to provide supplemental briefing. Dkt. Nos. 154, 155, 156, 157. The Court held oral argument on the motion for preliminary injunction, during which the Department's

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 10

counsel stated that Defendants would be moving to dismiss later that day. Dkt. No. 167 at 24. After briefing on the motion to dismiss was complete, the Court denied that motion. Dkt. No. 190.

The Court now turns to consider Plaintiff States' motion for preliminary injunction. As Plaintiff States have met their burden to show that preliminary relief is warranted, the Court will grant the motion.

## II.   ANALYSIS[3]

### A.   Legal Standards

"Preliminary injunctive relief is an extraordinary equitable remedy that is never awarded as of right." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024) (citation modified). "The purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Doe v. Horne*, 115 F.4th 1083, 1098 (9th Cir. 2024) (citation modified).

To succeed on a motion for preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).

---

[3] The threshold jurisdictional issues raised in Defendants' opposition brief were subsequently expanded in a motion to dismiss, which the Court denied. *See* Dkt. No. 190. Thus, this order addresses only the remaining issues as to the injunction sought by Plaintiff States.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 11

**B.    Plaintiff States Are Likely to Succeed on the Merits of at Least One of Their APA Claims.**

As noted earlier in this order, the complaint brings several claims against Defendants challenging the lawfulness of the discontinuation decisions, including that the discontinuation decisions are arbitrary and capricious under the APA as well as constitutional theories.  *See* Dkt. No. 1 ¶¶ 121–51.  Plaintiff States argue that they are likely to succeed on the merits of their APA claims as well as their Spending Clause claim.  Dkt. No. 49 at 23.  For the following reasons, the Court finds that Plaintiff States are likely to succeed on the merits of their arbitrary and capricious APA claim and have therefore satisfied the first *Winter* factor.[4]

Courts must set aside agency action[5] that is "arbitrary" and "capricious."  5 U.S.C. § 706(2)(A).  The "well-worn arbitrary-and-capricious standard ensures that an administrative agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The Court finds that Plaintiff States have met their burden to show that they are likely

---

[4] Because the Court finds that Plaintiffs are likely to succeed on the merits of their "arbitrary and capricious" APA claim, it need not address whether Plaintiffs are likely to succeed on other claims to find that the first *Winter* factor has been satisfied.  *See, e.g.*, *Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, No. 25-1407 (PLF), __ F. Supp. 3d __, 2025 WL 2158340, at *14 n.6 (D.D.C. July 30, 2025).

[5] Defendants do not contest that the discontinuation decisions represent final agency action.  *Compare* Dkt. No. 49 at 24–25 *with* Dkt. No. 147 at 16–17.  Nor do they directly dispute that Plaintiff States are within the "zone of interests" protected by the APA.  *See, e.g.*, *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 914 (N.D. Cal. 2025) (explaining that the APA's "zone of interests" test "is not especially demanding" and "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue" (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 667 (9th Cir. 2021)).  The Court finds no such apparent defect in Plaintiff States' interest in lawful agency action here, for the reasons explained with respect to standing and injury in the prior order denying Defendants' motion to dismiss (Dkt. No. 190), particularly because Defendants do not directly contend otherwise.  *See* Dkt. No. 180 at 6 n.3 (Defendants' reply brief to the motion to dismiss, contending that whether Plaintiff States satisfy the "zone of interests" test is "beside the point").

to succeed on the merits of their APA claim that the discontinuation decisions are arbitrary and capricious in at least two ways.

      *1. The Discontinuation Decisions are Likely Arbitrary and Capricious as Unexplained and Conclusory.*

First, Plaintiff States argue that the discontinuation decisions are arbitrary and capricious because they do not contain individualized reasons for not renewing the Grants. Dkt. No. 49 at 26 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) (finding agency action arbitrary and capricious where a party is "compelled to guess at the theory underlying the agency's action")). As even Defendants acknowledge (Dkt. No. 189 at 14), the decisions are generic and identical, were all issued the same day, and recite a disjunctive list of reasons that the Grants are not in the best interests of the federal government (stating that the discontinued grants "violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds"). *See, e.g.*, Dkt. No. 102-5 at 2. The decisions neither identify *which* principle or principles are in conflict with the Grant, nor explain *why* the Grants conflict with any principle. *Id.* According to Plaintiff States, this lack of individualized reasoning renders the decisions arbitrary and capricious because they are left guessing why the Grants were discontinued. Dkt. No. 150 at 15.

Defendants argue that no further explanation is required. Because the regulations permit the Department to discontinue a grant if it is found to be in the best interest of the federal government to do so, and the Department identified the criteria it applied to make this determination, Defendants posit that they have satisfied their obligation to provide a reasonable explanation for the decision. Dkt. No. 147 at 17. This argument is not persuasive. In reviewing an agency decision, courts look to whether the agency "examined 'the relevant data' and

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 13

articulated 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicles Mfrs.*, 463 U.S. at 43). Here, there is no evidence the Department considered any relevant data pertaining to the Grants at issue and it is undisputed that it provided no Grant-specific explanation of the application of the Department's new "best interest" criteria. In the absence of any findings, the Court cannot determine whether the Department's decision bears a rational connection to the facts. Rather, the discontinuation decisions are wholly conclusory, which prevents meaningful judicial review.[6]

Although an agency decision need not be written with "ideal clarity" (*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation modified)), Defendants concede that an agency must demonstrate that its decision "was the product of reasoned decisionmaking." Dkt. No. 147 at 16–17 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52). Beyond an unsupported assertion that the decisions were "reasonable and reasonably explained" (*id*. at 16), Defendants make no effort to analogize the discontinuation decisions or the process by which the decisions were reached to the cases they cite. *See id*. at 16–17. Indeed, Defendants' counsel admitted at oral argument that he had no information about how the Department decided which Grants to discontinue, and that the record contains none. Dkt. No. 167 at 38. Because the Court agrees with Plaintiff States that the discontinuation decisions are unexplained and

---

[6] The complete lack of explanation also precludes a meaningful opportunity to seek reconsideration. The discontinuation notices advise Grantees that under 34 C.F.R. § 75.253(g), they may seek reconsideration of the Department's decision, however, they "must submit information and documentation supporting" their position. *See e.g.*, Dkt. No. 103-4 at 2. But without any information as to the factual basis for the Department's decision, such a process would require Grantees to guess at the Department's rationale, mount arguments against such a rationale, *and* provide documentation to do so. Such a process contravenes the APA. *See Washington v. U.S. Dep't of Com.*, No. C25-1507 MJP, 2025 WL 2978822, at *8 (W.D. Wash. Oct. 22, 2025) ("One is effectively left to guess at what the new priorities are and why the awards are now misaligned with them—this violates the APA.").

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 14

conclusory, the Court finds that Plaintiff States have shown a likelihood of success on the merits of their APA claim on this basis.

> ### 2. The Discontinuation Decisions are Likely Arbitrary and Capricious Because the Department Did Not Consider Reliance Interests.

Plaintiff States argue that Defendants failed to consider the Grantees' reliance interests before issuing the discontinuation decisions. Dkt. No. 49 at 27–28. The Supreme Court has explained that an agency acts arbitrarily and capriciously when it changes an existing policy without considering "'serious reliance interests.'" *Wages & White Lion Invs.*, 604 U.S. at 568 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). Plaintiff States submitted evidence establishing that the Department had previously instructed Grantees that continued funding depended on their project performance as measured against the Department's published priorities. Introducing new considerations pertaining to the interests of the federal government for the first time in discontinuation decisions fails to account for the time and resources Grantees invested in structuring their projects and budgets to conform to the performance data that they reasonably believed would help them ensure continued funding. Dkt. No. 49 at 27 (citing Dkt. No. 65 ¶ 22, Dkt. No. 86 ¶ 11–12, Dkt. No. 87 ¶ 11, Dkt. No. 100 ¶ 13, Dkt. No. 101 ¶ 15, Dkt. No. 103 ¶ 13, Dkt. No. 104 ¶ 20).

Defendants argue in opposition that because the regulations explicitly instruct that continuation awards are not automatically granted, such that future funding is not guaranteed, Grantees should not have developed reliance interests on future funding. Dkt. No. 147 at 17. Defendants' litigation position on the strength of the Grantees' reliance interests is not an adequate substitute for the Department's consideration of the Grantees' reliance interests at the time of the discontinuation decisions, however. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020) (where an agency is "not writing on a blank slate" it is "required

to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" (citation modified)).  In other words, the Department should have considered the Grantees' reliance interests at the time the decisions were made, and Defendants' post-hoc legal arguments cannot remedy this failure.  *See Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 668 (9th Cir. 2023) ("[A]n agency 'must defend its actions based on the reasons it gave when it acted,' not with post hoc rationalizations." (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 24)).   Because there is no evidence before the Court that Defendants considered any reliance interests (as Defendants conceded at oral argument (Dkt. No. 167 at 38–39)), the Court finds Plaintiffs are likely to prevail on their APA claim challenging the discontinuation decisions as arbitrary and capricious on this basis as well.

For these reasons, the Court finds that Plaintiffs have met their burden to show a likelihood of success on the merits on at least two APA theories, thus satisfying the first *Winter* factor.

## C.   Plaintiffs States Have Presented Evidence They Are Likely to Suffer Irreparable Harm Without Preliminary Relief.

Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for damages" after a full adjudication on the merits.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  Monetary harm does not typically constitute irreparable harm, as economic losses can generally be recovered at a later date.  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  "But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable."  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (citing *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)).  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.  A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must

*demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation modified).

The Ninth Circuit has recognized that Plaintiffs in APA cases can show irreparable harm where agency action causes a "significant change in their programs and a concomitant loss of funding[.]" *E. Bay Sanctuary Covenant*, 993 F.3d at 677 ("Both constitute irreparable injuries: the first is an intangible injury, and the second is economic harm for which the Organizations have no vehicle for recovery."). Courts have likewise found irreparable harm in cases alleging APA violations where a plaintiff shows serious "'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding." *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 925 (N.D. Cal. 2025) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

Plaintiff States make this showing. They have submitted declarations detailing numerous irreparable harms flowing from the discontinuation decisions, such as the immediate cessation of mental health services to students in rural and underserved parts of Plaintiff States, staff layoffs in Grantee programs, a steep decline in graduate student retention in Grant-funded training programs, the mid-year termination of scholarships and research projects, the halt to a Grantee university's accreditation process, and the dismantling of the workforce development programs in Plaintiff States that the Grants were intended to promote. *See* Dkt. No. 101 ¶ 19; Dkt. No. 103 ¶¶ 19, 24; Dkt. No.104 ¶ 34. As the MHSP and SBMH programs were created to support multi-year projects in Plaintiff States to benefit students and schools, it is unsurprising that discontinuing Grant funding mid-project would cause harm to the States' interests. Congress created these programs to address the states' need for school-based mental health services in their schools, and has repeatedly reaffirmed the need for those services over the years by reauthorizing and increasing

appropriations to these programs. This further supports the Grantees' testimony that an interruption in the provision of financial support would harm the Plaintiff States.

Defendants argue in opposition that at least some of these harms are borne not by Plaintiff States but by Grantees, and are merely speculative in any event. Dkt. No. 147 at 26–27. As explained in the Court's prior order denying Defendants' motion to dismiss, however, whether a Grantee is an instrumentality of the State or not, Plaintiff States are likely to be concretely injured by the discontinuation of any Grant. *See* Dkt. No. 190 at 12–13. And Plaintiff States have submitted declarations from Grantee representatives explaining how the discontinuation decisions are already impacting Plaintiff States' students, prospective school psychologists, and community partnerships, even if the Grant funding is not discontinued until December 31, 2025.[7] *See, e.g.*, Dkt. No. 101 ¶ 19 (explaining that the University of Washington Tacoma cannot admit the full number of students into school psychology graduate program without Grant funding), Dkt. No. 103 ¶ 19 (a public agency in Washington that supports school districts and schools was forced to lay off two employees in August 2025 because budgets are planned for an entire school year, and fewer social work graduate student interns can be supervised in the 2025–26 school year), Dkt. No. 105 ¶ 21 (explaining that the discontinuation of fellowship funding means that the University of Wisconsin-Madison's cohort of six graduate students will not be able to participate in professional development training to allow them to graduate on time in May 2026).

And although Defendants emphasize that Grantees may file new applications and could be awarded similar grants in the future, new funding could not remedy all of the harms flowing from

---

[7] Plaintiff States have not made this showing with respect to Plaintiff Nevada, however. The only declaration from a Nevada Grantee indicates that its Grant funding was scheduled to expire on September 30, 2025, before the effective date of the discontinuation decision. *See* Dkt. No. 92 ¶ 8. Plaintiff States resist dismissal of Nevada because "it has demonstrated a stake in declaratory relief[.]" Dkt. No. 150 at 9 (citing Dkt. No. 92 ¶¶ 13–18). But because Plaintiff States have failed to show that Plaintiff Nevada has an interest in *injunctive* relief, the Court will exclude Nevada from the scope of the preliminary injunction.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 18

the discontinuation decisions.  That school budgets in future years could include mental health services cannot remedy the lack of such services for this school year, and schools and graduate programs will be harmed by a loss of expertise in staff members, even if they could eventually rehire staff for those positions. *See, e.g.*, Dkt. No. 101 ¶ 24 ("There is no way to recover lost time or restore continuity once disrupted, and staff who depart will take their training and expertise with them, requiring new investment in recruitment, hiring, and training."); *see also Cmty. Legal Servs.*, 780 F. Supp. 3d at 924–25 (finding a likelihood of irreparable harm where plaintiffs demonstrated that the Government's termination of funding would cause a "non-speculative loss of substantial funding" that would require plaintiffs to "issue layoff notices and threaten[] to require them to dismiss their specialized and seasoned attorneys").

Moreover, because the Department has started the process to recompete the discontinued funds with different priorities (*see* Dkt. No. 179), once those funds are awarded elsewhere, Grantees may lose access to funding entirely without preliminary relief. *See, e.g.*, *City of Fresno v. Turner*, No. 25-cv-07070-RS, 2025 WL 2721390, at *19 (N.D. Cal. Sep. 23, 2025) (finding a disruption in federal funding "cannot be remedied down the line with money alone as Defendants contend because by then projects on which millions of taxpayer dollars have already been spent, and which require years to complete and coordination across many parties, will have been compromised").

For all these reasons, Plaintiff States have demonstrated a likelihood of imminent irreparable harm flowing from the discontinuation decisions.  This conclusion is not undermined by the timing of this suit and/or request for preliminary relief, despite Defendants' contention that Plaintiff States' two-month delay in filing suit after the discontinuation decisions were issued suggests that any harm is not imminent. Dkt. No. 147 at 26.  The Ninth Circuit has held that a plaintiff's "long delay before seeking a preliminary injunction implies a lack of urgency and

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 19

irreparable harm." *Oakland Trib., Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). But the timing here does not evince a "long delay": the suit was filed two months after the discontinuation decisions were issued, and this reaction appears reasonably swift, particularly considering the number of Plaintiff States and Grantees involved and that other lawsuits were also filed to address the discontinuation decisions. *See* Dkt. No. 109. The motion for preliminary injunction was filed nine days after the suit was filed. Dkt. No. 49. This timeline does not undermine the evidence supporting the likelihood of imminent irreparable harm.

Accordingly, the Court finds that Plaintiff States have made the requisite showing as to the second *Winter* factor.

**D.      The Balance of Equities Tips in Plaintiffs' Favor and an Injunction is in the Public Interest.**

As noted above, the third and fourth *Winter* factors merge when a preliminary injunction is sought against the Government, and the Court must therefore determine whether the balance of equities and public interest favor injunctive relief. *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021).

The Court finds that these factors easily favor injunctive relief. The hardships faced by Plaintiff States, whose schools depend so heavily (if not entirely) on federal funding to achieve Congress's goals for the MHSP and SBMH programs, in the absence of an injunction far outweigh the hardship to the Government in pausing the recompeting of funds to allow lawful continuation decisions to be rendered.

Likewise, the public is served by requiring the Government to provide reasoned explanations and to consider reliance interests when changing a position via agency actions, and by setting aside arbitrary and capricious agency decisions that fail to do so. *See, e.g.*, *Azar*, 911 F.3d at 581 ("The public interest is served by compliance with the APA[.]"); *League of Women*

*Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). That "democratically accountable leaders at the Department" (Dkt. No. 147 at 28) authorized the discontinuation decisions does not relieve them from compliance with longstanding requirements for lawful agency action. *See Valle del Sol*, 732 F.3d at 1029 (holding that it "is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law" (citation modified)).

Although Defendants complain that "[t]he public interest is harmed when the United States is forced to pay out funds that it may not be able to recover" (Dkt. No. 147 at 27), Plaintiff States do not ask this Court to order Defendants to pay out any funds. The preliminary relief Plaintiff States request instead enjoins the implementation of the discontinuation decisions to allow time for lawful decisions to be issued before the funds are reallocated.

Defendants also suggest that this action could have been obviated if Grantees had simply requested reconsideration of the discontinuation decisions, and therefore the extraordinary remedy of injunctive relief tips the equities against Plaintiff States. Dkt. No. 147 at 28. As explained earlier, however, the discontinuation decisions do not provide a reasoned explanation for the discontinuation of the Grants, which leaves Grantees guessing as to the Department's rationale. Requiring Grantees to seek reconsideration of an unspecified rationale would be a waste of time, particularly where Defendants do not dispute that the discontinuation decisions represent final agency action.

Because all of the *Winter* factors have therefore been satisfied, the Court will grant Plaintiff States' motion but must, in the next section of this order, determine the scope of the preliminary injunction to be issued.

1

2

**E.      The Scope of the Injunction Is Limited to Grants Documented In Plaintiff States Other Than Nevada.**

3

4       When a plaintiff satisfies its burden to demonstrate that a preliminary injunction should

5   issue, "that injunctive relief should be no more burdensome to the defendant than necessary to

6   provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  But

7   "[t]here is no general requirement that an injunction affect only the parties in the suit." *Bresgal v.*

8   *Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987).  "[A]n injunction is not necessarily made over-broad

9   by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if

10  it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which*

11  *they are entitled*." *Id.* at 1170–71.

12      Here, Plaintiff States do not request an injunction that extends beyond their borders into

13  other states or to the nation as a whole, but they do request statewide relief as to themselves.  It is

14  unclear whether the Grantees who filed declarations constitute all the discontinued Grants in

15  Plaintiff States, or whether they are merely representative of a larger group.  *See, e.g.*, Dkt. No.

16  189 at 43.  In any event, though the Court found that Plaintiffs States had sufficiently alleged an

17  Article III injury arising from the discontinuation of any Grant awarded within its borders (Dkt.

18  No. 190 at 11–12), there is insufficient evidence of irreparable harm to infer that enjoining the

19  implementation of *every* discontinuation decision in Plaintiff States is required to provide complete

20  relief to Plaintiff States.  *See, e.g.*, *LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48,

21  58 (2d Cir. 2004) (explaining that where plaintiffs submit evidence permitting an inference that

22  testifying plaintiffs are similarly situated in terms of irreparable harm to all other plaintiffs, then a

23  "court could permissibly engage in inductive reasoning to reach the conclusion that *every* plaintiff

24  suffered the threat of irreparable harm").  And the situation of Plaintiff Nevada (discussed earlier)

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 22

supports the exercise of caution, as the Court is aware that not every discontinuation decision may cause irreparable harm to Plaintiff States.

Accordingly, the Court declines to infer without proof that Plaintiff States are likely to be irreparably harmed by the discontinuation of every Grant within each state. At this point, the Court will therefore limit the scope of the preliminary injunction to those Grants about which the Court has evidence of irreparable harm flowing from the discontinuation decisions, as detailed below.

**F.      No Bond Is Required.**

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation modified).

Here, the Court waives the imposition of any bond on Plaintiff States. "In public-interest litigation where the court enjoins unlawful agency action, a nominal bond is appropriate, especially where, as here, the government-defendant fails to provide any evidence that an injunction would impose a substantial cost." *Washington v. U.S. Dep't of Transp.*, __ F. Supp. 3d __, 2025 WL 1742893, at *31 (W.D. Wash. June 24, 2025) (citation modified). And in recent cases enjoining federal agency defendants, courts have waived the bond requirement altogether. *See, e.g.*, *King County v. Turner*, 785 F. Supp. 3d 863, 893 (W.D. Wash. 2025); *Los Angeles Press Club v. Noem*, __ F. Supp. 3d __, 2025 WL 2658327, at *24 n.33 (C.D. Cal. Sep. 10, 2025); *Washington*, 2025 WL 1742893, at *31.

Defendants suggest that a "bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed."

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 23

Dkt. No. 147 at 30.  But again, Plaintiff States do not request an order requiring Defendants to continue the Grants.  Because Defendants' argument depends on a mischaracterization of Plaintiff States' requested relief, and because Defendants have not shown that the relief actually sought would impose any cost, the Court denies their request for a bond in its entirety.

**G.    A Stay Pending Appeal Is Not Warranted.**

Defendants request that "[i]f the Court issues an injunction, … it be stayed pending a determination by the Solicitor General whether to appeal and, if appeal is authorized, pending any appeal."  Dkt. No. 147 at 30.  Defendants do not explain why this relief is warranted, or address any of the factors that would impact the Court's analysis of the issue.  In the face of this cursory request, the Court will deny Defendants' request for a stay pending appeal.

### III.   CONCLUSION

For these reasons, the Court GRANTS Plaintiffs' motion for preliminary injunction (Dkt. No. 49) as modified herein:

1. Defendants and all their respective officers, agents, servants, employees and attorneys, and any person in active concert or participation with them who receives actual notice of this order are hereby fully enjoined from the following:

> a. implementing or enforcing through any means the discontinuation decisions as to affected Grantees, including recompeting Program funds;
>
> b. reinstituting the discontinuation decisions based on the same or similar reasons, including denying a continuation award based on performance issues, if any, caused by the Department's discontinuation decision and its disruptive effects.

2. Defendants must immediately take every step necessary to effectuate this Order, including clearing any administrative, operational, or technical hurdles to implementation, and notifying affected Grantees that the discontinuances have been set aside.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 24

3. This injunction is limited to the following Grantees located within Plaintiff States: Santee School District; Northern Humboldt Union High School District; San Diego County Office of Education; Los Angeles Unified School District; Madera Unified School District; Para Los Niños; McKinleyville Union School District; University of Redlands; Tulare County Office of Education; Ukiah Unified School District; California State Polytechnic University, Humboldt; California State University, East Bay; Santa Maria-Bonita School District; California State University, Long Beach; Marin County Office of Education; the Multicultural Learning Center; Solano County Office of Education; University Corporation at Monterey Bay; Conejo Valley Unified School District; San Francisco State University; Santa Clara County Office of Education; University of Northern Colorado; University of Colorado Denver; University of Denver; Metropolitan State University of Denver; Colorado Department of Education; University of Connecticut; University of Delaware; Northern Illinois University; Illinois State Board of Education; University of Massachusetts Boston; Bowie State University; University of Maryland, Baltimore; Maine Department of Education; Michigan Department of Education; Grand Valley State University; Central Region Educational Cooperative; Binghamton University; University of Buffalo; the Research Foundation for the State University of New York; Portland State University; Oregon State University; Rhode Island Department of Elementary and Secondary Education; Educational Service District 112; University of Washington; Northwest Educational Service District 189; Educational Service District 105; University of Wisconsin-Madison; Wisconsin Department of Public Instruction.

4. Defendants' counsel shall provide written notice of this Order within 24 hours to all Defendants, and their employees, contractors, and affected Grantees.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 25

5. Defendants' counsel shall file a status report within 48 hours, documenting the actions that they have taken to comply with this order, including a copy of the notice and an explanation as to whom the notice was sent.

6. A bond is not necessary under these circumstances and the Court exercises its discretion not to require one.

7. This preliminary injunction remains in effect pending further orders from this Court.

Dated this 27th day of October, 2025.

Kymberly K. Evanson
United States District Judge